**Jeno F. PAULUCCI, Plaintiff,**

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.**

**No. 6:01–CV–129–ORL28DAB.**

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 20, 2002.

plaint (Doc. 21, filed May 1, 2001), Count I alleges Liberty Mutual breached the insurance contract by failing to provide coverage for the collapse and demolition of the Ideal Garage and related expenses, Count II requests that the court enter a declaratory judgment that the insurance policy was binding and enforceable and that Liberty Mutual breached the contract by failing to provide coverage, and Count III alleges statutory bad faith pursuant to Sections 624.155(1)(b)(1) and 626.9541(1)(i), Florida Statutes. Liberty Mutual's Amended Answer and Affirmative Defenses (Doc. 43, filed July 17, 2001) includes a counterclaim for declaratory relief that Liberty Mutual is not liable for any insurance proceeds under the subject contract.

David H. Simmons, Drage, de Beaubien, Knight, Simmons, Mantzaris & Neal, Orlando, FL, for Plaintiff.

Joh J. Pappas, Butler, Burnette, Pappas, Tampa, FL, for Defendant.

### ORDER

DUFFY, District Judge.

On September 16, 2000, one-third of the roof of the Ideal Garage in the City of Sanford, Florida collapsed. In October 2000 the remaining building was demolished. The Ideal Garage was owned by Jeno F. Paulucci, who has filed this action against his insurer, Liberty Mutual Fire Insurance Company ("Liberty Mutual"). Of Mr. Paulucci's Second Amended Com-

Now before the court are cross-motions for summary judgment filed by Mr. Paulucci and Liberty Mutual (Docs. 83 and 55 respectively).[1] Both motions address Liberty Mutual's affirmative defenses that the loss was not covered by the insurance contract; that Mr. Paulucci breached the policy's examination-under-oath requirement; that Mr. Paulucci breached the policy's cooperation and document production requirements; and that Mr. Paulucci breached the policy's misrepresentation and concealment provision. Also, Liberty Mutual alone moves for summary judgment on its affirmative defense that Mr. Paulucci breached the non-action clause. I find that Mr. Paulucci has satisfied the examination-under oath-requirement and there-

1. Additional documents considered by the court include Plaintiff's Memorandum of Law in Support of his Dispositive Motion for Summary Judgment (Doc. 84); Liberty Mutual's Memorandum of Fact and Law in Opposition to Plaintiff's "Dispositive" Motion for Summary Judgment (Doc. 98); Plaintiff's Supplemental Memorandum of Law in Support of his Dispositive Motion for Summary Judgment (Doc. 130); Liberty Mutual Fire Insurance Company's Response to "Plaintiff's Supplemental Memorandum of Law in Support of

his Dispositive Motion for Summary Judgment" (Doc. 140); Plaintiff's Second Supplemental Memorandum of Law in Support of His Dispositive Motion for Summary Judgment (Doc. 136); Liberty Mutual's Memorandum of Law in Support of Its Dispositive Motion for Summary Judgment (Doc. 102); Plaintiff Jeno F. Paulucci's Response to Defendant Liberty Mutual Fire Insurance Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 94).

fore is entitled to summary judgment on this affirmative defense. With respect to all other affirmative defenses, material issues of disputed and unresolved fact preclude summary judgment.

## I. Facts

The disputed insurance contract (the "Liberty Mutual policy") was entered into by Liberty Mutual and Luigino's, Inc. on May 1, 2000, specifically naming Mr. Paulucci as an insured. The policy included coverage for the Ideal Garage at 201 E. Commercial Avenue in downtown Sanford, Florida. The Ideal Garage was a two-story structure built in the 1920s and was most recently used by Mr. Paulucci for storage. On September 16, 2000, a third of the roof of the Ideal Garage collapsed during Tropical Storm (formerly Hurricane) Gordon. The parties disagree on the magnitude of the storm and the building's condition prior to the storm. As will be more fully set forth below, there are substantial disputed facts relating to the cause of the collapse as well as the parties' conduct after the incident. It is undisputed, however, that in October 2000 Mr. Paulucci demolished the remaining structure, that on December 28, 2000 Mr. Paulucci filed this suit, and that on January 31, 2001 Liberty Mutual formally denied coverage.

## II. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In ruling on a motion for summary judgment, "[t]he function of the court is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial.'" *Lockett v. Wal–Mart Stores, Inc.,* No. Civ.A. 99–0247–CB–C, 2000 WL 284295, at *2 (S.D.Ala. Mar.8, 2000) (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505).

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.,* 131 F.3d 995, 999 (11th Cir. 1997). "The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir.1991); *see also* Fed. R.Civ.P. 56(e) (providing that nonmovant's response "must set forth specific facts showing that there is a genuine issue for trial").

## III. Discussion

The paramount dispute in this action is whether the Liberty Mutual policy covers the loss suffered by Mr. Paulucci resulting from the collapse of the Ideal Garage. Mr. Paulucci asserts that the record before this court establishes that coverage exists and that Liberty Mutual's failure to provide coverage constitutes a material breach of the insurance contract. Liberty Mutual, on the other hand, asserts that the record supports a finding that coverage does not exist. In their respective mo-

tions, both parties argue that they are entitled to summary judgment with respect to the following affirmative defenses raised by Liberty Mutual in support of its contention that Mr. Paulucci has forfeited any rights he would otherwise have to insurance proceeds: Liberty Mutual's defense that Mr. Paulucci's loss is expressly excluded under the anti-concurrent cause provision of the contract; Liberty Mutual's defense that Mr. Paulucci breached the Examination Under Oath provision of the contract; Liberty Mutual's defense that Mr. Paulucci failed to produce books and records or otherwise cooperate with an investigation of the claim as required by the contract; and Liberty Mutual's defense that Mr. Paulucci intentionally concealed or misrepresented material facts and circumstances, thus breaching the policy's Misrepresentation, Concealment and Fraud provision. Further, Liberty Mutual alone claims that it is entitled to summary judgment on its defense that Mr. Paulucci breached the Non–Action Clause of the contract. This Order also addresses Mr. Paulucci's argument that Liberty Mutual defaulted on the insurance contract in October 2000 by failing to make a coverage determination and refusing to pay demolition costs, and that this default released Mr. Paulucci from all post-loss obligations set forth in the policy. The following analysis will address each of these issues in turn.

### A. The Concurrent Cause Doctrine, the Anti–Concurrent Cause Affirmative Defense, and the Cause of the Collapse

Liberty Mutual's policy was in full force and effect with respect to the Ideal Garage on September 16, 2000 when its roof collapsed. The parties dispute both the factual issue of what caused the collapse and the legal question of whether coverage extends under the Liberty Mutual policy for the collapse of the Ideal Garage if it is determined that the loss was concurrently caused by a covered and an excluded peril.

Mr. Paulucci argues that Tropical Storm Gordon dumped excessive rain on the Ideal Garage, causing a pooling of water on the roof, and that this buildup resulted in the collapse. Therefore, according to Mr. Paulucci, the policy, which extends coverage for flood, collapse, and other damages including windstorm, must cover his loss. Liberty Mutual disputes the severity of the storm and whether an excessive amount of water did pool on the roof. According to Liberty Mutual, the collapse was caused by the deteriorated condition of the building—including wet and dry rot—and that loss resulting from such wear and tear is expressly excluded from coverage.

Liberty Mutual claims that pursuant to the anti-concurrent cause provision in the contract, a loss resulting from both a covered cause including windstorm and an excluded cause including rot does not entitle the insured to the proceeds of the insurance contract. The applicable exclusion in the Liberty Mutual policy states:

EXCLUSIONS:

> We will not pay for "loss" caused directly or indirectly by any of the following. **Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."**
>
> \* \* \* \* \* \*
>
> N. Wear and tear; rust, corrosion, fungi, decay, deterioration, wet or dry rot; hidden or latent defect or any condition in property that causes it to damage or destroy itself.

(emphasis added). Accordingly, Liberty Mutual argues loss caused directly or indirectly by rot is excluded. The anti-concurrent cause language is the sentence that states, "Such 'loss' is excluded regardless of any other cause or event that contributes concurrently or in any sequence to

the 'loss.'" Mr. Paulucci argues that the anti-concurrent cause language is invalid pursuant to Florida law.

With respect to whether coverage for the collapse of the Ideal Garage under the Liberty Mutual policy is excluded pursuant to the anti-concurrent cause provision, the court must first ascertain the prevailing standard under Florida law for determining coverage when a loss is caused by both a covered and an excluded peril in the absence of anti-concurrent cause language. As set forth below, I find the prevailing standard to be the concurrent cause doctrine. The question then becomes whether parties can contract around this default doctrine through anti-concurrent cause language. This must be answered in the affirmative. Thus, when a peril is concurrently caused by a covered and an excluded cause, coverage does not exist if the contract contains an anti-concurrent cause provision. Finally, in evaluating whether the anti-concurrent cause provision provides a defense in the instant case, there must be a factual determination as to whether the loss was caused by an excluded cause. Ultimately, summary judgment is not warranted for either party on this affirmative defense because questions of fact remains as to the storm's impact on the garage and as to the extent to which the structural condition of the garage was less than ideal.

*1. The Concurrent Cause Doctrine is the Prevailing Standard in Florida when Multiple Perils are Independent*

As set forth by Florida's Third District Court of Appeal in *Wallach v. Rosenberg*, 527 So.2d 1386 (Fla. 3d DCA 1988), the concurrent cause doctrine is the prevailing standard under Florida law. As explained in the *Wallach* decision, which was materially influenced by the Supreme Court of California's opinion in *State Farm Mutual Automobile Insurance Co. v. Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514

P.2d 123 (1973), the concurrent cause doctrine mandates that coverage shall be provided when a loss would not have occurred but for the joinder of independent covered and excluded causes. In *Wallach*, the Florida court explained:

> The appellants' second contention is that where concurrent causes join to produce a loss and one of the causes is a risk excluded under the policy, then no coverage is available to the insured. We reject that theory and adopt what we think is a better view—that the jury may find coverage where an insured risk constitutes a concurrent cause of the loss even where "the insured risk [is] not ... the prime or efficient cause of the accident." 11 G. Couch, Couch on Insurance 2d § 44:268 (rev. ed.1982).

527 So.2d at 1387. Liberty Mutual asserts that *Wallach* is an anomaly and that the prevailing standard in Florida when multiple causes result in a loss is not the "concurrent cause doctrine" but the "efficient proximate cause doctrine." The efficient proximate cause doctrine, as explained and applied by Florida's First District Court of Appeal in *Hartford Accident and Indemnity Co. v. Phelps*, 294 So.2d 362, 364 (Fla. 1st DCA 1974), mandates that coverage shall be provided for loss caused by multiple perils when the efficient proximate cause of the loss is a covered peril. *Hartford*, following the Supreme Court of California court in *Sabella v. Wisler*, 59 Cal.2d 21, 27, 27 Cal.Rptr. 689, 377 P.2d 889 (1963), quotes Couch on Insurance to explain, " '[T]he efficient cause—the one that sets the others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster.' " *Hartford*, 294 So.2d at 364 (quoting 6 Couch on Insurance (1930), § 1466). Importantly, the *Sabella* court held that the efficient proximate cause standard was mandated by Sections 530 and 532 of the

California Insurance code. *Sabella*, 59 Cal.2d at 33–34, 27 Cal.Rptr. 689, 377 P.2d 889. *See also Howell v. State Farm Fire & Cas. Co.*, 218 Cal.App.3d 1446, 267 Cal. Rptr. 708 (1990) (providing a useful overview of the evolution of the efficient proximate cause doctrine in California).

■ The concurrent cause doctrine and efficient proximate cause doctrine are not mutually exclusive. Rather, they apply to distinct factual situations. The concurrent cause doctrine applies when multiple causes are independent. The efficient proximate cause doctrine applies when the perils are dependent. Causes are independent when they are unrelated such as an earthquake and a lightning strike, or a windstorm and wood rot. Causes are dependent when one peril instigates or sets in motion the other, such as an earthquake which breaks a gas main that starts a fire.

Using this last example of dependent perils, the court notes that if an earthquake is an excluded/proximate cause but fire is a covered/secondary cause, coverage would not exist under the efficient proximate cause doctrine. Conversely, if the earthquake is a covered/proximate cause but fire is an excluded/secondary cause, coverage would exist under the efficient proximate cause doctrine. However, under a different factual setting where the excluded earthquake and covered fire were independent such as where loss is caused by an unrelated simultaneous earthquake and lightning strike, the efficient proximate cause doctrine would be inapplicable. In this scenario, the concurrent causation doctrine would apply and mandate coverage regardless of which peril was covered and which peril excluded.

In doing so I adhere to the sound reasoning of Florida's Third District Court of Appeal in *Wallach* which, relying on *Partridge*, explained that the efficient cause language of both *Sabella* and *Hartford* "offers little analytical support where it can be said that but for the joinder of two independent causes the loss would not have occurred." *Wallach*, 527 So.2d at 1388. I am not persuaded by the Supreme Court of California's decision in *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal.3d 395, 257 Cal.Rptr. 292, 770 P.2d 704 (1989), which limited *Partridge*'s concurrent causation analysis to third party liability insurance actions. Ultimately, California's allegiance to the efficient proximate cause doctrine in first party insurance actions is rooted in a state statutory scheme that has been thoroughly interpreted by California courts. Without a comparable statutory scheme in Florida and without Florida authority applying the efficient proximate cause doctrine to first party insurance contracts when relevant perils are independent, I must find the concurrent cause doctrine is the prevailing default standard in Florida.

*2. Plaintiff's Challenge to the Anti–Concurrent Cause Provision, Specifically, and to the Wear and Tear Exclusion, Generally*

■ Having recognized the existence of the concurrent cause doctrine under Florida law, the next question is whether parties to an insurance contract governed by Florida law can contract around the doctrine by expressly including an anti-concurrent cause provision. To reiterate, the anti-concurrent cause language in the Liberty Mutual policy states, "Such 'loss' is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.'" The *Wallach* decision, applying the concurrent cause doctrine as discussed above, expressly noted that there was no claim that the subject insurance contract contained a provision which specifically excludes coverage where a covered and an excluded cause combine to produce a loss. *Wallach*, 527 So.2d at 1388; *see also W. Am. Ins. Co. v. Chateau*

*La Mer II Homeowners Ass'n,* 622 So.2d 1105, 1108 (Fla. 1st DCA 1993) (holding that pursuant to the subject insurance policy and Florida law coverage existed for damage to balconies which resulted from both a covered cause (hidden decay) and an excluded cause (faulty design) and expressly noting that there was "no contention here that the policy contains a provision which specifically excludes coverage where a covered and an excluded cause combine to produce a loss"). Thus, based on the *Wallach* and *Chateau La Mer II* decisions, I must conclude that, under Florida law, parties can contract around the concurrent cause doctrine through an express anti-concurrent cause provision.

Moreover, courts applying Florida law as well as the law of other states have upheld the validity of provisions excluding coverage where loss results from a combination of covered and non-covered causes. In *Berg v. New York Life Insurance Co.,* 88 So.2d 915 (Fla.1956), the Florida Supreme Court considered a double indemnity provision in a life insurance contract that covered death resulting solely from external, violent, and accidental causes, but expressly excluded coverage for death resulting directly and indirectly from illness. Because the facts established that death resulted from a combination of the deceased having been violently ambushed in his home by robbers and having a blood vessel disease, the court held that the double indemnity provision did not apply.

In a more recent case, the Florida Third District Court of Appeal in *State Farm Fire and Casualty Co. v. Metropolitan Dade County,* 639 So.2d 63 (1994), held that the insurer, paying proceeds after Hurricane Andrew, did not have to compensate policyholders who rebuilt or were rebuilding their homes for structural improvements mandated by law where the policy excluded loss from the enforcement of any ordinance or law regulating the construction and repair of a building. Applying the anti-concurrent cause provision, the court held that this loss of having to satisfy more rigid structural requirements was excluded regardless of "whether other causes acted concurrently or in any sequence with the excluded event to produce the loss." *Metropolitan Dade,* 639 So.2d at 65 n. 3.

In *Front Row Theatre Inc. v. American Manufacturer's Mutual Insurance Companies,* 18 F.3d 1343 (6th Cir.1994), the Sixth Circuit recognized the validity of an anti-concurrent cause provision that employed the exact language used in the Liberty Mutual policy at issue here.[2] In *Front Row,* the court determined that water damage to a theater carpet was caused in part by surface water flooding and in part by water that backed up from a sewer. The policy contained an exclusion for flood damage with an exemption that provided coverage for damage caused by water which had backed up from a sewer or drainage system. The exclusion also had an anti-concurrent cause provision. In relevant part, the policy stated:

G. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following: **Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.**

\* \* \* \* \* \*

g. Flood

1) Including surface water, waves, tides, tidal waves, overflow of any body of

---

**2.** Although not expressly stated in the opinion, the Sixth Circuit appears to be applying Ohio law.

water of their spray, all whether driven by wind or not;

2) Mudslides or Mudflow. **But if loss or damage by fire, theft, explosion, water that backs up from a sewer or drain or sprinkler results, we will pay for that resulting loss or damage.**

*Front Row,* 18 F.3d at 1345 n. 1. (emphasis added). Because these facts established that the damage was caused by both surface water, which was an excluded cause, and a backed up sewer, which was an exemption to the exclusion and thus constituted a covered cause, the Sixth Circuit found that the anti-concurrent cause language mandated that the insurer would not have to pay proceeds.

In explaining its reasoning, the Sixth Circuit noted that "[w]hen damage to an insured's property is caused by both a covered and an excluded event, coverage may be expressly precluded by language in the policy." *Front Row,* 18 F.3d at 1347. The *Front Row* opinion also quotes Couch on Insurance for the proposition, " 'Exceptions and exclusions in a policy of public liability insurance must be given effect according to their express terms.... [A] court cannot rewrite the contract of the parties.' " *Front Row,* 18 F.3d at 1347 (quoting George C. Couch, Cyclopedia of Insurance Law, § 44.A:2 (2d ed.1981)). As in *Front Row,* in the instant case the anti-concurrent cause language of the Liberty Mutual policy has been agreed to by the contracting parties and must be applied.

Mr. Paulucci challenges the anti-concurrent cause language in the Liberty Mutual policy both as being void as against public policy and as being negated by the "Windstorm or Hail deductible clause" in the contract. In arguing that the anti-concurrent cause language in the Liberty Mutual policy is void as against public policy, Mr. Paulucci cites cases applying insurance law of the states of California and Washington.

Those cases do not apply Florida law and therefore are not controlling.

■ Mr. Paulucci also claims that the Liberty Mutual policy's "Windstorm or Hail deductible clause" negates the anti-concurrent cause provision. The applicable language is on a page of the policy entitled, "WINDSTORM OR HAIL DEDUCTIBLE–FLORIDA CHANGES." Under the subheading "WINDSTORM OR HAIL DEDUCTIBLE CLAUSE," the policy sets forth:

The Windstorm or Hail deductible clause applies to each occurrence of "loss" to Covered Property caused directly or indirectly by Windstorm or Hail, **regardless of any other cause or event that contributes concurrently or in any sequence to the loss.** If "loss" from a covered cause of loss other than Windstorm or Hail occurs, and that "loss" would not have occurred but for the Windstorm or Hail, such "loss" shall be considered to be caused by Windstorm or hail and therefore part of the Windstorm or Hail occurrence.

With respect to Covered Property at a location identified in the schedule, no other deductible applies to Windstorm or Hail.

We will not pay for "loss" in any one occurrence until the amount of "loss" exceeds the applicable DEDUCTIBLE AMOUNT as shown in the schedule. We will then pay the amount of "loss" that exceeds the DEDUCTIBLE AMOUNT, up to the applicable LIMIT OF INSURANCE shown in Item 4 of the Policy DECLARATIONS.

(bold emphasis added). Mr. Paulucci claims that this provision modifies the Basic Coverage Form of the Policy by setting forth that no matter what caused the loss (whether a covered or uncovered cause), if the loss was caused directly or indirectly

by windstorm then the loss will be treated as a windstorm or hail occurrence.

I cannot agree. This provision only modifies the scope and application of the deductible should windstorm be a contributing cause. The first two sentences read together indicate the following. First, the intention of the provision is to apply the windstorm or hail deductible when windstorm or hail directly or indirectly contributes to the loss, and second when another "covered" loss occurs, such as fire damage, that would not have happened but for windstorm or hail, the other covered loss will be treated as part of the windstorm or hail with respect to the deductible. Because the windstorm and hail deductible clause modifies application of the deductible only, it does not negate anti-concurrent language in the exclusion section of the policy's General Policy Conditions.

■ In addition to challenging the anti-concurrent cause provision, Mr. Paulucci also directly attacks application of the Wear and Tear exclusion to the present facts. In this respect, Mr. Paulucci first makes the legal argument that any rot present in the Ideal Garage was a "condition" of the building and does not constitute a "cause" of the collapse that would invoke the exclusion. The distinction between rot as a condition of the building and rot as a cause of the collapse of a building is factual. At its extreme, severe rot of a wood structure can be a cause or contributing cause of a collapse. Whether any rot at the Ideal Garage rose to the level of a "cause" of the building's demise is a question of fact.

I am not convinced by Mr. Paulucci's contention that a condition does not constitute a cause unless the condition itself would have resulted in the loss. Applying this argument to the facts of this case, Mr. Paulucci argues that any rot impacting the Ideal Garage would not constitute a cause of the collapse unless the roof would have given way due to rot on September 16, 2000 regardless of the storm. But an event may result from more than one cause, even when any single cause in-and-of-itself would not bring about the event. In the instant case, if the facts ultimately establish that the Ideal Garage would not have collapsed but for both the storm and the rot, it would be illogical for either of these factors to be excluded as a "cause."

Moreover, the plain language of the policy would be rendered meaningless if Wear and Tear could not constitute a cause. The exclusion states, "We will not pay for 'loss' caused directly or indirectly by any of the following: ... Wear and Tear; ... wet or dry rot." (emphasis added). If the contracting parties did not believe that wear and tear could ever constitute a cause of a loss, the Wear and Tear exclusion would be entirely superfluous. The fact that the Wear and Tear exclusion is contained in the policy indicates that the contracting parties believed Wear and Tear could be a cause of a loss. Ultimately, Mr. Paulucci's attempts to limit the definition of cause are unpersuasive.

■ Mr. Paulucci further argues that the Wear and Tear exclusion, which encompasses rot, defies common sense because all buildings have some wear and tear that will be a contributing factor in any collapse. Therefore, Mr. Paulucci argues, if the wear and tear exclusion was sufficient to deny coverage, the policy is a sham and unconscionable. This argument is unpersuasive. Although all buildings may have some wear and tear and many buildings have some rot, not all buildings have rot so severe as to jeopardize the structural integrity the building. When this threshold is reached, as explained above, a condition of the subject building may reasonably constitute the cause of its demise. Thus, under the Liberty Mutual policy, buildings with rot are not excluded

from coverage unless that rot can be reasonably determined to be a contributing "cause" of the loss. This interpretation comports with the public policy objectives of promoting safety and keeping insurance premiums down. By allowing parties to an insurance contract to exclude coverage when the loss is caused or partially caused by rot, the party in control of the insured property has a greater incentive to correct potentially dangerous rot damage.

■■■■ Mr. Paulucci further argues that the Wear and Tear exclusion in the Liberty Mutual policy is ambiguous. It is well-established that language in insurance policies that is subject to differing interpretations should be liberally construed in favor of the insured and strictly against the insurer. *See State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1076 (Fla. 1998). Under Florida law, exclusionary clauses are narrowly construed in favor of coverage. *See Croom's v. Monticello*, 692 So.2d 255 (Fla. 1st DCA 1997). Nevertheless, each argument advanced by Mr. Paulucci in support of his contention that the policy is ambiguous has failed to convince me.

Mr. Paulucci's first argument is that ambiguity of the Wear and Tear exclusion is evidenced by the Commercial Property Claims Procedural Manual allegedly relied upon by Liberty Mutual. This manual states:

Insurance policies include the words, corrosion and erosion. These are precise and specific. It is appropriate to ask a metallurgist if a physical condition is corrosion or is erosion.

Insurance policies also contain the word deterioration and the **phrase wear and tear, which are not precise and specific.** Whether they are the physical condition complained of is the expertise for

adjuster's determination, not the consultant's. Such determination may be made based on the metallurgist's expert assessment of the initiation of a condition and its history.

(Doc. 130, Ex. 1) (emphasis added). Although the phrase "wear and tear" itself may be ambiguous, the Liberty Mutual policy has qualifying language. Pursuant to the policy, the exclusion applies to loss caused by: "Wear and tear; rust, corrosion, fungi, decay, deterioration, wet or dry **rot;** hidden or latent defect or any condition in property that causes it to damage or destroy itself." (emphasis added). The exclusion for rot, as a subset of wear and tear, is abundantly clear.[3]

According to Mr. Paulucci, the Wear and Tear exclusion is also rendered ambiguous and imprecise because the policy expressly covers "collapse." Mr. Paulucci cites *Tire Kingdom v. First Southern Insurance Co.*, 573 So.2d 885 (Fla. 3d DCA 1990), for the standard that "[a]n insurance policy cannot grant rights in one paragraph and then retract them in another." Granting an express coverage for collapse, however, is not contradicted by excluding coverage for rot. Collapse may result from numerous causes such as an earthquake or negligent construction. There is no ambiguity created by excluding coverage for the collapse when the collapse is caused by an excluded peril, namely rot.

*3. The Record Presents Disputed Facts as to what Caused the Collapse of the Ideal Garage*

■■■ Although the collapse of the Ideal Garage will not be covered by the Liberty Mutual policy if the loss was caused in whole or in part by rot, the parties present conflicting evidence as to the condition of the Ideal Garage prior to the collapse as

---

**3.** The Commercial Property Claims Procedural Manual, which may or may not be relied on

by Liberty Mutual with respect to the subject policy, has little probative value.

well as to the impact of Tropical Storm Gordon on the building. Considering the totality of the evidence in the record including evidence in support of the magnitude of the storm, it would appear that the Ideal Garage may have had rot but that a question of fact remains whether its condition rose to the level of causing or concurrently causing the collapse.

In support of its contention that the Ideal Garage had extensive rot which caused the collapse, Liberty Mutual first relies on Mr. Paulucci's structural expert, William Stuhrke. As to the condition of the section of the Ideal Garage that collapsed, Mr. Stuhrke testified during his deposition, "There was wet rot; there was dry rot; there was deterioration." (Doc. 81, Stuhrke Dep. p. 29, II. 5–12). Further, when asked a question addressing whether the integrity of any of the structural members that had suffered from wet rot, dry rot, decay, and deterioration was impaired, he responded, "Absolutely." (Doc. 81, Stuhrke Dep. p. 29, II. 13–21). In addition, when asked if the reason he believed that the entire building was in danger of imminent collapse after the roof failed was in part due to wet rot, dry rot, decay, and deterioration of the building's structural members, Mr. Stuhrke answered affirmatively. (Doc. 81, Stuhrke Dep. p. 59, II. 1–10).

Liberty Mutual also relies on its own expert, Lawrence Dombrowski, who testified at his deposition that the collapse resulted from wet and dry rot and the deteriorated condition of the building. More specifically, Mr. Dombrowski explained that the wood framing which consists in part of rafters, roof decking, and girder trusses had rotted due to long-term water exposure. (Doc. 98, Dombrowski Dep., p. 48—p. 49). He elaborated that some of the ends of the rafters had rotted away such that the rafters were not even supported by the girders. (Doc. 98, Dom-

browski Dep., p. 51, II. 3–5). Granted, Mr. Paulucci cites other testimony of Mr. Dombrowski indicating that there could have been pooled water on the roof and that the exact cause of the failure is unknown. (Doc. 98, Dombrowski Dep., p. 121, II. 6–14; p. 123, II. 15–25). However, in responding to questions asked by counsel for Liberty Mutual, Mr. Dombrowski subsequently clarified that when he stated that the exact cause of the failure was unknown he was referring to the "last trigger" or "straw-that-actually-broke-the-camel's-back." (Dombrowski Dep., Doc. 98, pp. 158—159). The totality of Mr. Dombrowski's deposition testimony conveys Mr. Dombrowski's opinion that the Ideal Garage would not have collapsed but for the deteriorated condition of its structural members.

Mr. Paulucci, on the other hand, provides evidence that the condition of the Ideal Garage did not cause the collapse. Local businessmen Carey Ferrell and Don Knight testified during their depositions that the Ideal Garage appeared solid (Doc. 68, Knight Dep., p. 22, II. 10–13; Doc. 66, Ferrell Dep., p. 46–48). Mr. Ferrell elaborated that he was there every day while the building was being demolished and that except in some very limited instances where doors had contacted the ground there appeared to be no deteriorated timbers. The most significant factor, however, suggesting that rot may not have caused the collapse is Mr. Paulucci's evidence with respect to the severity of Tropical Storm Gordon in Sanford and its impact on the Ideal Garage.

Mr. Paulucci's expert, Mr. Stuhrke, opined in his April 25, 2001 report that the collapse of the east side of the Ideal Garage was most likely the result of an excessive accumulation of water on the roof of the building due to very heavy and severe rain. (Doc. 84, Ex. 8). This con-

clusion is bolstered by Mr. Ferrell's testimony that his and other flat roofed buildings in downtown Sanford adjacent to Mr. Paulucci's property that were built during a similar period had serious problems with respect to the potential for collapse due to the pooling of water on their roofs. He explained that such buildings are plagued by an "inordinate number of pigeons" whose nesting clogs drainage systems overnight. According to Mr. Ferrell's experience, every time drains clog in this manner and a hard rain occurs, water builds up on the top of buildings. (Doc. 66, Ferrell Dep. p. 46. I. 13—p. 48. I. 12). Mr. Ferrell also testified that "given the amount of water that was dumped into the shop next door" he believed the amount of rain on top of the Ideal Garage caused the collapse.

Liberty Mutual challenges Mr. Paulucci's position with regard to the severity of the storm and the storm's impact on the building. Additional deposition testimony of Mr. Paulucci's expert, Mr. Stuhrke, indicates that although he stated that there was excess water on the roof, he had no basis for determining how much water was on the roof at the moment of the collapse. (Doc. 81, Stuhrke Dep. p. 41, I. 24—p. 42, I. 16 and p. 51, I. 25—p. 52, I. 11). In addition, Kenneth Bloom, Mr. Paulucci's employee responsible for the maintenance of the Ideal Garage, testified that the drains and scruppers were in working order and unclogged when he last inspected the roof two to three days before the collapse. (Doc. 63, Bloom Dep. p. 8, I. 17—p. 10, I. 9.) Tom Stevenson, who was Mr. Paulucci's director of real estate in Florida and responsible for the maintenance of the Ideal Garage, further confirmed that no one has suggested to him and that he has no reason to believe "that the failure to keep drains and scruppers clean was a contributing cause of the pooling and ponding of water on the roof that caused the collapse." (Doc. 80, Stevenson

Dep., p. 45, I. 4—p. 46, I. 7). Moreover, Liberty Mutual's expert meteorologist, Mr. Sherman, testified that 1.95 inches of rain fell between September 16, 2000 at 8:00 a.m. and September 17, 2000 at 8:00 a.m. at the Sanford Water Treatment Plaint, approximately three miles from the Ideal Garage, and that it is his opinion that the vast majority of rain associated with Tropical Storm Gordon fell on Sanford after the building collapsed. (Doc. 76, Sherman Dep. p. 58, II. 7–24; p. 64, I. 2–8).

Ultimately, the record presents conflicting evidence as to the prior condition of the Ideal Garage before the collapse and as to the severity of Tropical Storm Gordon in downtown Sanford. Thus, summary judgment is not warranted on the issue of whether preexisting rot was a cause or contributing cause of the collapse. Thus, whether coverage is voided by preexisting rot is a question for the trier of fact and precludes summary judgment.

**B. Failure to Submit to Examination Under Oath Affirmative Defense**

██ Because Mr. Paulucci substantially complied with the examination under oath provision of the Liberty Mutual policy before filing this action, Mr. Paulucci is entitled to summary judgment on Liberty Mutual's affirmative defense that Mr. Paulucci breached this requirement. The provision which entitles Liberty Mutual to examine Mr. Paulucci states:

> If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim. This includes your books and records. In such event, your answers must be signed.

The applicable facts with respect to the examination under oath affirmative defense are as follows. The Liberty Mutual policy was entered into between Luigino's, Inc. and Liberty Mutual naming Mr. Pau-

lucci as an additional insured. Luigino's, Inc. is an entity involved in the management of Mr. Paulucci's properties. With respect to the Ideal Garage claim, Liberty Mutual directed an examination oath notice to Luigino's, Inc. On December 7, 2000 Larry Nelson, a member of the board of directors of Luigino's, Inc., was produced to testify on behalf of Mr. Paulucci. (Doc. 70, Nelson Examination). At that time, Mr. Nelson provided Liberty Mutual over one thousand documents for examination. For four hours Mr. Nelson answered Liberty Mutual's questions regarding the circumstances surrounding the collapse of the building, the condition and maintenance of the building, the insurance claim, and Mr. Paulucci's financial affairs. On occasion, Mr. Nelson did not know the answers to a question, asserted a work product privilege, or deferred to others including counsel. During the December 7, 2000 examination, the parties agreed that Liberty Mutual could reexamine Mr. Nelson, examine other representatives of Mr. Paulucci, and directly examine Mr. Paulucci. It was also agreed that Mr. Paulucci would produce additional documents. In a letter dated December 14, 2000, Liberty Mutual scheduled additional examination under oath on February 15, 2001. After Mr. Paulucci filed suit on December 28, 2000, Liberty Mutual ceased efforts to continue the examination.

The parties now dispute whether Mr. Paulucci breached the examination under oath requirement. Liberty Mutual claims that by producing Mr. Nelson in place of Mr. Paulucci himself, Mr. Paulucci breached the insurance contract. However, Liberty Mutual neither objected to examining Mr. Nelson nor ceased the examination once learning that Mr. Paulucci, not Luigino's Inc., had the sole financial interest in the Ideal Garage. Liberty Mutual further claims that Mr. Nelson had insufficient knowledge as to the condition of the Ideal Garage, the causes of the collapse, and the insurance claim. Having reviewed the transcript of the examination, I am unpersuaded. Although Mr. Nelson could not answer all of the questions, I find no indication that he was not the most knowledgeable person to respond to the range of questions asked.

 Liberty Mutual also claims that Mr. Paulucci breached the examination under oath provision by filing suit prior to the additional examinations agreed to by the parties and prior to submitting all of the requested documentation. Under Florida law it is clear that the failure to comply with an insurance policy's examination under oath requirement constitutes a breach, *Goldman v. State Farm Fire Gen. Ins. Co.*, 660 So.2d 300 (Fla. 4th DCA 1995). However, neither Liberty Mutual or Mr. Paulucci has submitted controlling authority as to whether the filing of an action by the insured against the insurer prior to subsequent examinations agreed to by the parties constitutes a breach. I find that by answering four hours of questions and submitting numerous documents, Mr. Nelson, on behalf of Mr. Paulucci, substantially satisfied the examination under oath provision of the policy. This was neither a scenario where the insured produced an unknowledgeable representative for the purpose of avoiding examination nor a scenario where the examination was prematurely cut short. The fact that Liberty Mutual had some unanswered questions at the conclusion of the examination and that Mr. Paulucci agreed to help Liberty Mutual obtain answers through additional examinations does not mean that the examination of Mr. Nelson was insufficient to satisfy Mr. Paulucci's obligations under the contract. Accordingly, Mr. Paulucci is entitled to summary judgment on Liberty Mutual's affirmative defense that Mr. Pau-

lucci breached the examination under oath requirement.

### C. Failure to Produce Books and Records or Otherwise Cooperate with an Investigation Affirmative Defense

■ In pertinent part, the Liberty Mutual policy states that the insured shall, "Permit [Liberty Mutual] to inspect the property and records proving the 'loss' as often as may reasonably be required," and "[Mr. Paulucci] must cooperate with [Liberty Mutual] in the investigation or settlement of the claim." Liberty Mutual asserts that Mr. Paulucci was repeatedly requested to produce documents concerning the historical condition of the Ideal Garage, the causes of the collapse, and the amount of the claim. According to Liberty Mutual, Mr. Paulucci breached the insurance contract's cooperation and document-production requirements by failing to produce the following pertinent material:

(1) Books and records over three years old including correspondence pertaining to the condition of the building in the late 1980's and early 1990's (Doc. 102, Ex. 21 and 22);

(2) A June 30, 2000 appraisal of the building (Doc. 102, Ex. 25);

(3) A final expert report addressing the condition of the Ideal Garage before the collapse and the cause of the collapse;

(4) Documents in the Plaintiff's Privilege Log claimed by Mr. Paulucci to be work product (Doc. 102, Ex. 23);

(5) Correspondence, reports, documents and opinions of Mr. Paulucci's experts, Mr. John Braga (Doc. 102, Ex. 29), Edward Cox, and Mr. Stuhrke; and

(6) The identity and reports of Mr. Paulucci's structural experts, referred to in a September 27, 2000 letter from Mr. Paulucci's counsel to Liberty Mutual, who opined that "the collapse of the Building occurred due to excessive rainfall associated with Hurricane Gordon."

Mr. Paulucci claims that he has satisfied the cooperation requirement and has sufficiently shared relevant, non-privileged information. To this end, Mr. Paulucci claims that he has provided Liberty Mutual over one thousand two hundred documents including (a) a record of expenses for consideration and settlement of the claim (b) a Proof of Loss, and (c) the final report of Mr. Paulucci's structural expert retained to investigate the collapse.[4] Mr. Paulucci also contends that Liberty Mutual requested numerous irrelevant documents. Further, Mr. Paulucci states that Liberty Mutual and its structural experts were given repeated access to the Ideal Garage prior to its demolition. Moreover, Mr. Paulucci maintains that several of the documents Liberty Mutual claims should have been produced, such as the reports, correspondence, and opinions of Mr. Paulucci's experts, were withheld as work product or pursuant to the attorney-client privilege.

■ Having considered the record, I find that a question of disputed fact exists as to whether Mr. Paulucci breached his obligations under the Liberty Mutual Policy by failing to cooperate with the investigation and produce relevant documents. Despite Liberty Mutual's contention that the work product doctrine cannot abrogate Mr. Paulucci's contractual obligation to produce documents materially relevant to the loss, I find that documents and opinions prepared in anticipation of litigation need not have been turned over. *Cf. Eastern Air Lines, Inc. v. United States Aviation Underwriters*, 716 So.2d 340 (Fla. 3d DCA 1998) (holding that the cooperation clause in an insurance contract does not

---

4. Liberty Mutual claims that the final report of Mr. Paulucci's expert was not produced until after Mr. Paulucci filed suit.

eviscerate the attorney-client privilege codified in Section 90.502, Florida Statutes). Accordingly, questions of fact exist as to whether the documents claimed as privileged by Mr. Paulucci were in fact prepared in anticipation of litigation. Ultimately, to determine whether Mr. Paulucci breached the cooperation and document production requirements, a trial is necessary to determine what documents were privileged. After that determination, a finding may be made as to whether the totality of Mr. Paulucci's production and cooperation sufficiently met his obligations. Accordingly, summary judgment on this affirmative defense is denied.

### D. Misrepresentation and Concealment Affirmative Defense

 Because disputed facts exist as to whether Mr. Paulucci intentionally misrepresented or concealed material facts, both Mr. Paulucci's and Liberty Mutual's motions for summary judgment on this affirmative defense are denied. In pertinent part, the Liberty Mutual policy sets forth:

> If you or any other insured under this Policy **intentionally** conceal or misrepresent, or have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance or any other claim under this insurance, **whether before or after a "loss,"** then this entire Policy is void as to you and any other insured.

(emphasis added). Under Florida law, insurance provisions which void coverage if the insured makes an intentional misrepresentation after loss are valid and enforceable. *Wong Ken v. State Farm Fire & Cas. Co.,* 685 So.2d 1002 (Fla. 3d DCA 1997). Mr. Paulucci, nevertheless, makes unpersuasive arguments challenging the validity of this provision.

First, Mr. Paulucci argues that pursuant to Section 627.409, Florida Statutes, concealment and misrepresentation only void coverage when the true facts, if known to the insurer, would have caused the insurer not to have provided coverage with respect to the hazard resulting in the loss. However, Section 627.409, entitled "Representations in applications; warranties," is wholly inapplicable and cannot be logically applied to after-loss misrepresentations and concealments.

Second, Mr. Paulucci argues that the above-quoted misrepresentation and concealment provision was replaced by a more limited misrepresentation and concealment provision pursuant to form IM 1449 MC R2 (02 93), which was incorporated into the Liberty Policy in the section entitled "SCHEDULE OF ORIGINAL POLICY FORMS AND ENDORSEMENTS MAKING UP THIS POLICY AT ITS INCEPTIONS." This argument fails because form IM 1449 MC R2 (02 93) was employed in the endorsements entitled "General Policy Conditions—Wisconsin Changes" and "Minnesota Changes," and do not apply to losses in Florida.

Having found the misrepresentation and concealment provision valid, I have considered the alleged facts and incidents alleged by Liberty Mutual to have constituted a breach by Mr. Paulucci. With respect to misrepresentation, Liberty Mutual claims that Mr. Paulucci misrepresented material facts within a September 27, 2000 letter sent by Mr. Paulucci's counsel to Liberty Mutual. This letter stated that a structural engineer opined that the collapse of the Ideal Garage occurred due to excessive rainfall associated with Hurricane Gordon. Mr. Paulucci maintains that this letter was referring to Mr. Stuhrke's preliminary findings and that such findings were accurate. Not only does a question of disputed fact exist as to whether the letter was intended to mislead, a question of disputed

fact remains, as discussed above, as to the cause of the collapse.

Liberty Mutual's affirmative defense based on concealment is closely related to its affirmative defense that Mr. Paulucci failed to produce material documents or cooperate with the investigation. As stated above, questions of fact exist as to whether documents claimed as work product by Mr. Paulucci were prepared in anticipation of trial. Moreover, the misrepresentation and concealment provision expressly requires the insured to possess the intent to deceive. A trial is necessary to determine if Mr. Paulucci harbored such intent, and summary judgment on this affirmative defense is denied.

**E. Liberty Mutual's defense that Mr. Paulucci breached the Non–Action Clause**

Liberty Mutual also moves for summary judgment based on Mr. Paulucci's alleged violation of the non-action clause of the policy. In pertinent part, this provision states:

LEGAL ACTION AGAINST US

No one may bring legal action against us on this Policy unless:

A. There has been full compliance with all the terms of the Policy.

As stated above, Mr. Paulucci satisfied the examination under oath requirement. As to whether Mr. Paulucci breached the contract by failing to produce documents and cooperate with Liberty Mutual's investigation or by intentionally misrepresenting or concealing material facts and circumstances, issues of unresolved fact remain as explained above. Accordingly, summary judgment on the non-action affirmative defense is denied.

**F. Liberty Mutual's Alleged Default in October 2000**

Mr. Paulucci argues that Liberty Mutual defaulted in October 2000 by failing to make a coverage determination, failing to inform Mr. Paulucci when a decision would be made, and refusing to pay demolition costs. As a result of this alleged constructive breach, Mr. Paulucci claims he had no duty to sit for an examination under oath, produce documents, or otherwise provide information to Liberty Mutual. It is undisputed that the roof of the Ideal Garage collapsed on September 16, 2000 and that Mr. Paulucci filed this action on December 28, 2000. Mr. Paulucci has cited no Florida authority indicating that the failure to make a coverage decision in this time frame constitutes a constructive breach, and I find no reason to conclude that Liberty Mutual defaulted by not rendering a decision before January 31, 2001. Further, Mr. Paulucci claims that because the October 2000 demolition of the remaining building was mandated by city ordinance, the demolish costs were a loss covered by the policy and Liberty Mutual therefore defaulted by not acknowledging or paying such proceeds in October 2000. Even if the Liberty Mutual policy were to entitle Mr. Paulucci to proceeds for demolition expenses, I find no provision of the policy obligating Liberty Mutual to pay such proceeds a month after the collapse while still investigating the claim. Accordingly, I find no constructive breach on these grounds releasing Mr. Paulucci from his post-loss obligations.

**IV. Conclusion**

Based on the above analysis, Mr. Paulucci is entitled to summary judgment on Liberty Mutual's affirmative defense that Mr. Paulucci breached the examination under oath requirement. All other bases for summary judgment set forth by the parties fail to hold water. Accordingly, it is **ORDERED** and **ADJUDICATED** as follows:

1. Liberty Mutual's Dispositive Motion for Summary Judgment (Doc. 55) is **DENIED**.

2. Plaintiff's Dispositive Motion for Summary Judgment (Doc. 83) is **GRANTED in part** with respect to Liberty Mutual's affirmative defense that Mr. Paulucci breached the examination under oath requirement of the insurance contract, and **DENIED in part** in all other respects.

So ordered.