[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-12846

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 19, 2005
THOMAS K. KAHN
CLERK

D.C. Docket No. 03-21130-CV-JLK

GUIDEONE ELITE INSURANCE COMPANY,

Plaintiff-Counter-Defendant-Appellee,

versus

OLD CUTLER PRESBYTERIAN CHURCH, INC.,

Defendant-Counter-Plaintiff-Appellant,

J.A.W., Individually and as Legal Guardian/Parent
of E.S.W.,
E.S.W., Husband of J.A.W.,
J.S.W., as Legal Guardian/Parent of E.S.W.,

Defendants-Appellants,

P.W.,

Interested Party-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(August 19, 2005)**

Before BLACK, MARCUS and FAY, Circuit Judges.

FAY, Circuit Judge:

The defendants, a church and the victims of a multi-crime episode that commenced on church property, appeal a district court's award of summary judgment in favor of the plaintiff insurer. The insurer initiated this diversity action seeking a declaratory judgment adjudicating the meaning, interpretation and application of a sexual misconduct exclusion contained in the church's general commercial liability policy. The district court found that the underlying crimes at the hands of a third party criminal all arose out of an act of sexual misconduct, and found the sexual misconduct exclusion applicable, thereby limiting coverage to that afforded to acts of sexual misconduct under a separate liability coverage form. We disagree, finding that the underlying crimes are not excluded by virtue of the sexual misconduct exclusion, and reverse the district court's judgment with instructions.

## **Facts**

### *The Incident*

The tragic facts of this case are undisputed,[1] and though disturbing, the explicit

---

[1] We derive our facts from the Victim's Sworn Statement and Victim Questionnaire obtained during the underlying criminal investigation of this case, which were stipulated to by the parties in lieu of subjecting the victim in this case to a deposition. We applaud counsel for taking this approach.

details are, unfortunately, essential to our analysis. At around noon on October 16, 2002, J.A.W. (the "Victim"), a 31 year old mother, was picking up her three-year old daughter, E.S.W. (the "Daughter"), from the Little Disciples preschool at Old Cutler Presbyterian Church, Inc. (the "Church").[2] The Victim was also accompanied by her eight-month old baby boy, P.W. (the "Son"). As she was securing her children in her mini-van, a man came up behind her and tackled her while screaming, "If you want to live and you don't want to see your children die, get in the car, bitch." The perpetrator then struck her on the head, threw her into her van, and closed the door.

Once in the van, the perpetrator told the Victim that he had a knife, made her close her eyes, and stuck her with a very sharp object in the upper arm or neck before he headed into the back seat to sit next to the Daughter. The Daughter was screaming and attempted to get out of her seat and out of the van when the perpetrator pushed her back and forced her back into the seat, resulting in a bruise on her lower back. He then ordered the Victim into the passenger seat, sat himself in the driver's seat, turned-up the volume on the radio to try to mask the screams of the Victim and her children, and drove off in the van.

As they were driving, the perpetrator began engaging the Victim in

---

[2]The subsequent events of this date shall, hereinafter, collectively be referred to as the "Incident."

conversation. He told her, "Give me your money, give me your rings, give me your pin number to your ATM card," and "I also want something else from you, there are a few other things you're going to have to do for me." The perpetrator then had the Victim crouch down on the floor of the van to perform oral sex on him while he was driving. While the Victim was performing oral sex, the perpetrator began striking her in the back of the head because he was angry that he could not maintain an erection while the children were screaming and, thus, could not ejaculate.

After driving for about thirty minutes, the perpetrator stopped the van in a grassy area near a canal. He told the Victim to remove her pants, pulled his own pants down to his ankles, and asked her to perform more oral sex before climbing on top of her and having intercourse with her. During intercourse, the perpetrator asked the Victim to turn over, removed his penis, and began "spanking" her on the buttocks. He asked her if she liked to be hit during sex, she responded that she did not. Despite her response, he continued to hit her, asking her if it hurt. The Victim responded that it did not hurt because she thought that was what he wanted her to say, and he repeatedly hit her harder, stopping after three or four times. Intercourse then resumed and the perpetrator ejaculated, putting his penis in the Victim's mouth and saying, "You better swallow it all, you better swallow everything or I will kill you and your children. You do not want your children to die."

4

The perpetrator next had the Victim crouch down on the passenger side of the vehicle and told her that he needed money and needed to find a bank. He told her that he was unsure how to go about getting the money because he did not want to be seen on the cameras, nor did he want to send her into the bank, for fear that she would ask someone for help. Thinking out loud, the perpetrator named the different banks in the area, dismissing them for various reasons, until he remembered that there was a Bank of America with a drive-through ATM. He then instructed the Victim to drive and told her, "I'm going to sit in the back seat with your daughter and remember I have a knife." At that point, the perpetrator stuck the Victim with the knife and continued, "I'm not kidding around, I'm getting in the back with your children and you're going to withdraw the money, whatever you're able to withdraw and I want to see the receipt when you're done, I need to know how much money is in all your accounts."

The perpetrator drove to the Bank of America in Homestead, where he and the Victim switched places in the mini-van. The Victim was only able to withdraw $400 from the ATM and handed the receipt and money to the perpetrator. The Victim's husband's paycheck had just been deposited and, upon looking at the receipt, the perpetrator said he couldn't believe how much money the Victim had in the bank; he couldn't believe how he had gotten so lucky. He said he had to find a way to get the rest of it and that he could come back for the Victim if he needed to, because he was

5

going to get the all of the money.

The perpetrator again had the Victim switch places with him, so that he was again driving. He then told her that they were driving to a First Union bank. At First Union, he had the Victim get out of the car to withdraw money from a walk-up ATM, as this bank did not have a drive-through. After attempting to withdraw cash from her various accounts, the Victim returned to the car empty handed, explaining to the perpetrator that the ATM would not allow her to withdraw any more money. The perpetrator responded by screaming at her that "he had to have this money" but "if you know your children are in the car with me you're going to be too hysterical going into the bank, I don't know." The perpetrator then decided against sending the Victim into the bank to withdraw the money, said, "this is almost over for you," and began driving back towards the Church.

On their way back to the Church, the perpetrator decided that he was aroused once again, and made the Victim crouch down on the floor of the van to perform oral sex on him. The perpetrator was unable to ejaculate because the Victim's children were screaming too much. Instead, the perpetrator had her use her hands, and when that did not work, he ordered her to kiss his penis. He then drove into the Church parking lot but could not find a secluded area, so he drove into a wooded area opposite the Church and parked the van. The perpetrator told the Victim that he had

been nice to her and that he had intended to kill her and her children but had decided against it. He told her that she should be grateful and that she did a good job pleasing him.

Before he parted, the perpetrator returned the Victim's wedding rings, stating that he did not want to arouse her husband's suspicions by having her rings missing and making her promise not to tell her husband. He then told her to go home and take a shower, left the Victim and her children in the mini-van, and walked away.

*The Policy*

On the date of the Incident, the Church was covered by a primary liability insurance policy (the "Primary Policy") issued by GuideOne Elite Insurance Company (the "Insurer"). The Primary Policy contains a Commercial General Liability coverage form (the "CGL") providing limits of $1 million per occurrence and $2 million in the aggregate, with the following exclusion:

> any "personal and advertising injury," "bodily injury" and mental or emotional pain or anguish, sustained by any person arising out of or resulting from any actual or alleged act of sexual misconduct of any kind. [The Insurer] shall have no duty to investigate, settle, defend or pay any claim or suit asserting any act of sexual misconduct or any breach of duty contributing to such act.

(the "Sexual Misconduct Exclusion"). Neither the Primary Policy nor the CGL define "sexual misconduct." Because of the Sexual Misconduct Exclusion in the CGL, the

7

Church also purchased Sexual Misconduct Liability coverage (the "SML"), which applies to certain delineated acts of sexual misconduct and provides for $100,000 per occurrence and $300,000 in the aggregate. Though part of the Primary Policy, the SML is a separate coverage requiring a separate premium. The SML defines "Sexual Misconduct or Sexual Molestation" as:

> any activity which is sexual in nature whether permitted or unpermitted, including but not limited to sexual assault, sexual battery, sexual relations, sexual acts, sexual activity, sexual handling, sexual massage, sexual exploitation, sexual exhibition, photographic, video or other reproduction of sexual activity, sexual stimulation, fondling, intimacy, exposure of sexual organs, lewd, or lascivious behavior or indecent exposure, fornication, undue familiarity, or unauthorized touching.

In addition to the Primary Policy, which encompasses the CGL and the SML, the Church was also covered by an umbrella policy, which covers "bodily injury" and also contains the Sexual Misconduct Exclusion found in the CGL.[3] The limits of the umbrella policy are $5million per occurrence and $5 million in the aggregate.

*The Lawsuit*

Upon learning of the Incident, the Church notified its Insurer, and on May 6, 2003, anticipating a lawsuit against the Church by the Victim and her family[4], the

---

[3]The Insurer stipulated that any decision reached by the district court with regard to the Primary Policy would also apply to the umbrella policy.

[4]The Victim's family includes her Daughter, her Son, and J.S.W., her husband. The Victim and her family shall be, hereinafter, collectively referred to as the "Victims".

Insurer filed this declaratory judgment action (the "Federal Action"), seeking an adjudication of the meaning, interpretation and application of the Sexual Misconduct Exclusion. After this action was filed by the Insurer, the Church was sued for money damages in state court by the Victims (the "State Court Action"). That suit alleges that the Victim and her children were kidnapped while leaving the premises of the Church and subsequently assaulted and battered. It further alleges that the Church was negligent in failing to provide adequate security despite its knowledge of criminal activity in the area and in failing to warn patrons of that criminal activity. There is no specific mention of sexual activity or rape.

The Church then tendered the claim to the Insurer for defense and indemnity, pursuant to its CGL Policy. The Insurer made a unilateral determination that the perpetrator's subjective intent was sexual, and denied coverage under the CGL. Instead, the Insurer asserted that all the claims made by the Victims were covered only by the SML, which is subject to substantially less coverage than the CGL.

In a motion to amend and dismiss, the Church sought to implead its insurance broker as a party to the Federal Action, in order to bind it to the coverage ruling the district court was being asked to make. Because the Church's insurance broker was a Florida corporation, the Church argued that such a joinder would destroy diversity and that the district court should, accordingly, dismiss the Federal Action pursuant

to the doctrine of "procedural fencing." Prior to the district court's ruling on the motion to amend and dismiss, the Church filed a second motion to dismiss seeking to dismiss or stay the Federal Action in favor of a parallel state court declaratory action filed by the Church, which included the insurance broker as a defendant.

While these motions to dismiss were pending, the Insurer eventually moved for summary judgment in the Federal Action, contending that the Incident arose purely from an act of sexual misconduct, and thus, was excluded from the coverage afforded by the CGL, and subject only to the lower limits of liability provided by the SML. The Insurer argued that the negligence claims against the Church were within the scope of the exclusion, and that the exclusion applied even though the perpetrator was a third party and not an employee of the Church.

The Church and the Victims (collectively, the "Defendants") responded and filed cross-motions for summary judgment. The Victims argued that the injuries were not only a result of the sexual assault, but also as a result of the robbery and kidnapping, and, therefore, the exclusion should not apply. They further argued that an exclusion for injuries arising out of a specific act does not exclude coverage for a person whose negligent acts contributed to the commission of that act, and requested a declaration that there were multiple occurrences under the CGL, triggering the $2 million aggregate limit.

The Defendants both argued that the sexual misconduct exclusion was meant to apply to abuse by employees of the Church, not to attacks by third-party criminals, and that the undefined term "sexual misconduct" in the CGL form did not, under the common understanding of that term, encompass the violent abuse and rape involved in the Incident.

The district court disagreed with the Defendants and ultimately denied the motions to dismiss and granted the Insurer's motion for summary judgment, entering a final declaratory decree and judgment in favor of the Insurer and disposing of the Federal Action.

## Discussion

### I. *Motions to Dismiss*

We begin our discussion with the Church's contention that the district court erred in accepting jurisdiction over the Insurer's request for declaratory relief by denying the Church's motions to amend and dismiss. First, the Church argues that the district court should have abstained from deciding this Federal Action because the meaning and interpretation of the insurance contract in this case is governed by an unresolved issue of Florida state law. The Church accurately points out that neither the Florida Supreme Court, nor any of Florida's intermediate appellate courts, have considered the applicability or interpretation of the sexual misconduct exclusion at

11

issue in this case.

In support of its argument, the Church urges us to follow the Sixth Circuit's opinion in Scottsdale Ins. Co. v. Roumph, 211 F.3d 964 (6th Cir. 2000). In Scottsdale, the insurer sought a declaration that the underlying tort claim, based on an apparent rape, was excluded from the insured's general liability policy and, instead, subject to the lower policy limits of a sexual misconduct limitation endorsement (similar to the SML at issue here). Rather than decide on the meaning of the sexual misconduct exclusion, which was an unresolved issue of state law, the district court abstained in favor of the state court action, and the Sixth Circuit affirmed.

Although we agree with the reasoning in Scottsdale, we must review the district court's exercise of authority to proceed with a declaratory judgment action for abuse of discretion. Wilton v. Seven Falls Co., 515 U.S. 277, 289-90, 115 S.Ct. 2137 (1995). "When we say that a decision is discretionary, or that a district court has discretion to grant or deny a motion, we do not mean that the district court may do whatever pleases it. The phrase means instead that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Ameritas Variable Life Ins. Co. v. Roach, No. 05-10307, 2005 WL 1385212, at *2 (11th Cir. June 13, 2005) (per curiam) (citing Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984)). "The very concept of

12

discretion presupposes a zone of choice within which the trial courts may go either way."  Kern, 738 F.2d at 970-71.  Thus, when employing an abuse of discretion standard, we will leave undisturbed a district court's ruling unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard.

In cases such as this, the Supreme Court has expressed that "it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties."  Brillhart v. Excess Ins. Co. of America, 316 U.S. 491, 495, 62 S.Ct. 1173 (1942).  Here, as in Scottsdale, we would have affirmed the district court had it reached a different result, and if we were reviewing this matter de novo, we probably would have decided it differently.  "By definition, however, under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call.  That is how an abuse of discretion differs from a de novo standard of review."  In re Rasbury, 24 F.3d 159, 168 (11th Cir. 1994).  Though we feel that Florida's state court was better suited to construe its own unresolved issue of state law, we cannot go so far as to say that the district court's decision to exercise jurisdiction over this declaratory judgment action amounted to

13

an abuse of discretion. But it is certainly close to the extreme limits of such discretion.

The Church also argues that the district court should have allowed it to amend its counterclaim to add its non-diverse insurance broker as a party and then should have dismissed the Federal Action based on Fed.R.Civ.P. 19(b) and the doctrine of "procedural fencing." However, the district court's denial of the Church's motion for leave to amend its counterclaim to join additional parties is also reviewed for abuse of discretion. Spanish Broadcasting System of Fla., Inc. v. Clear Channel Communications, Inc., 376 F.3d 1065 (11th Cir. 2004) (leave to amend); Dean v. Barber, 951 F.2d 1210 (11th Cir. 1992) (joinder of additional parties).

In denying the Church's motion, the district court explained:

[The Church] asks the Court to join two additional parties to this action and then dismiss the action for the resulting lack of subject matter jurisdiction. [The] Motion is untimely because [the Church] waited until eight months after this suit was first filed in order to add these parties. However, the Court has considered the merits of [the Church]'s Motion and finds that the parties [the Church] seeks to add are not indispensable to this suit. Therefore, the Court will not prolong these proceedings by adding two new parties.

Because of the deference afforded to the district courts the abuse of discretion standard, we find no clear error of judgment, and, therefore, cannot say that the district court abused its discretion in denying the Church's motion to amend and then

14

dismiss.  Therefore, we do not disturb the district court's ruling.


## II. *Summary Judgment*

We now turn to the district court's summary judgment in favor of the Insurer. We review <u>de novo</u> a summary judgment ruling, applying the same legal standard used by the district court.  <u>Williamson Oil Co., Inc. v. Phillip Morris USA</u>, 346 F.3d 1287, 1298 (11th Cir. 2003).  "Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party."  <u>Witter v. Delta Airlines, Inc.</u>, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations and quotations omitted).  "An issue of fact is genuine, thus barring the entry of summary judgment, unless the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  <u>Piamba Cortes v. American Airlines, Inc.</u>, 177 F.3d 1272, 1292 (11th Cir. 1999) (citations and quotations omitted).

In granting summary judgment in favor of the Insurer, the district court found that the Sexual Misconduct Exclusion clause, which stated that "the [Insurer] shall

15

have no duty to investigate, settle, defend or pay any claim or 'suit' asserting any act of sexual misconduct *or any breach of duty contributing to such act*," clearly and unambiguously denied coverage for a negligence suit arising out of injuries sustained as a result of sexual misconduct. The court further interpreted "any act of sexual misconduct" to apply to the sexual misconduct of third parties. It, therefore, reasoned that, to the extent that the Victims sustained injuries that arose out of sexual misconduct, the Church's CGL did not apply.

The district court then went on to find that all of the perpetrator's non-sexual acts were incidental to and arose from his sexual acts, thus, finding that all of the underlying criminal acts of the perpetrator amounted to "sexual misconduct." As a result, the district court concluded that the CGL did not apply to any of the third party/perpetrator's actions, thus, triggering the coverage limits of the SML.

With regard to the SML, the district court concluded that because the criminal acts of the perpetrator were committed by a single individual, his conduct constituted a single occurrence for purposes of determining the Church's coverage.

The primary issue in this case is whether allegations of the Incident in the underlying State Action against the Church constitute acts "arising out of sexual misconduct" within the meaning of the CGL, such that they trigger the Sexual

16

Misconduct Exclusion of the Policy. Thus, we are now called upon to interpret a church's CGL Sexual Misconduct Exclusion in a case involving multiple crimes by a third party. As the Florida Supreme Court has not yet had occasion to construe "arising out of sexual misconduct" as it is used in the standard CGL, we approach this question as one of first impression to be resolved in a manner consistent with established general precepts of policy construction in place in the State of Florida.[5]

## A.

### 1. Ambiguity

Exclusionary clauses, generally considered contrary to the protective purpose of insurance, are construed narrowly against the insurer. See, e.g., Deni Assocs. of

---

[5]It is undisputed that Florida law governs the substantive issues in this case because jurisdiction is based on diversity of citizenship. The Florida Supreme Court has not spoken definitively on the issues before us, therefore, we look to relevant decisions of Florida's intermediate appellate courts. State Farm Fire & Casualty Co. v. Steinberg, 393 F.3d 1226, 1231 (11th Cir. 2004). A lack of explicit Florida case law on an issue does not absolve us of our duty to decide what the state courts would hold if faced with it. Arceneaux v. Texaco, Inc., 623 F.2d 924, 926 (5th Cir. 1980) (citations omitted). (In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.) "In the absence of precedents from Florida's intermediate appellate courts, however, we may consider the case law of other jurisdictions that have examined similar policy provisions." Steinberg, 393 F.3d at 1231 (citations omitted). Our objective is to determine issues of state law as we believe the Florida Supreme Court would, therefore a federal court attempting to forecast state law must consider whatever might lend it insight, including "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 663 (3d Cir. 1980).

Florida, Inc. v. State Farm Fire & Cas. Ins. Co., 711 So.2d 1135 (Fla.1998). In the absence of ambiguity in the policy language, however, rules of construction are unnecessary and courts will apply the plain language of the policy. See Riveroll v. Winterthur Intern. Ltd., 787 So.2d 891, 892 (Fla. 3d DCA 2001) ("where no ambiguity exists in the policy, we will not impose a construction contrary to its plain language").

"Sexual misconduct," though not defined in the CGL, has a single clearly defined meaning.[6] It is impossible to categorize the rape of the Victim as other than an act of sexual misconduct. Therefore, the rape of the Victim unambiguously falls within the Sexual Misconduct Exclusion.

The Florida courts have already defined and applied the term "arising out of" as "broader in meaning than the term 'caused by' and mean[ing] 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to,' or 'having connection with.'" Hagen v. Aetna Casualty & Surety Co., 675 So.2d 963, 965 (Fla. 5th DCA 1996) (citing National Indemnity Co. v. Corbo, 248 So.2d 238 (Fla. 3d DCA

_____

[6]"Absent a definition of a term in a document or policy, we may utilize the plain and generally accepted meaning of the term." Bohrer v. Church Mutual Ins. Co., 965 P.2d 1258, 1263 (Colo. 1998). The American Heritage Dictionary of the English Language (4th ed. 2000) defines "Sexual" as "Of, relating to, involving, or characteristic of sex, sexuality, the sexes, or the sex organs and their functions;" and "Misconduct" as "Behavior not conforming to prevailing standards or laws."

1971)).  The Florida courts have held that use of the phrase "arising out of" indicates a "causal relationship" to the incident.  See, e.g., Almayor v. State Farm Fire & Casualty Co., 613 So.2d 526 (Fla. 3d DCA 1993) (finding that exclusion did not apply because injuries did not "arise out of" particular excluded act, but rather, arose out of a coincidental and legally remote source).  This is consistent with the general consensus of other jurisdictions that the phrase 'arising out of' requires some causal connection to the injuries suffered, but does not require proximate cause in the legal sense.  See, e.g., Federal Ins. Co. v. Tri-State Ins. Co.,  157 F.3d 800, 804 (10ᵗʰ Cir. 1998) (collecting cases from various jurisdictions that discuss "arising out of" in the insurance context) (citations omitted).  "Indeed, cases interpreting the phrase 'arising out of' in insurance exclusionary provisions suggest a causation more analogous to 'but for' causation, in which the court examining the exclusion inquires whether there would have been personal injuries, and a basis for the plaintiff's suit, in the absence of the objectionable underlying conduct."  Bagley v. Monticello Ins. Co., 720 N.E.2d 813, 816 (Mass. 1999).

"Florida law cautions that courts must not add meaning to the terms of an insurance policy to create an ambiguity where none exists."  Ajax Building Corp. v. Hatford Fire Ins. Co., 358 F.3d 795, 799 (11th Cir. 2004) (citations omitted).  We find nothing about the Sexual Misconduct Exclusion ambiguous.  Consequently, the rule

19

concerning ambiguities is not applicable. The Defendants, correctly, do not contend that the Sexual Misconduct Exclusion is ambiguous. Moreover, though no Florida court has specifically examined such an exclusion, we find the Sexual Misconduct Exclusion here unambiguous, and, therefore apply its plain meaning.

*2. "Arising Out Of"*

It is now our chore to apply the admitted facts to the policy provision excluding injuries "arising out of" acts of sexual misconduct. The "plain meaning" of the exclusion begs the simple question: Did the non-sexual acts of the perpetrator "arise out of" the sexual acts? We find that they did not.

The Sexual Misconduct Exclusion here excludes coverage for injuries "arising out of or resulting from any actual or alleged act of sexual misconduct of any kind." The record, however, is replete with non-sexual acts committed by the perpetrator before and after the rape had taken place during the course of the Incident. Each non-sexual act, independent of the sexual acts, would constitute a distinct crime under Florida law. In particular, the Incident began when the perpetrator hit the Victim on the head and threatened to kill her children – acts constituting an assault under section 784.011, Florida Statutes, and a battery under section 784.03. In the initial minutes of the Incident, the perpetrator also battered the Daughter when he pushed her into

her car seat, bruising her back. The perpetrator committed aggravated assault under section 784.021 by threatening the Victim and her children with a knife twice – when first entering the van and again when he forced the Victim to withdraw money from the bank. The Victim was again battered when the perpetrator hit her on the head because the children were screaming while she performed oral sex on him. The perpetrator committed robbery under section 812.13 when he demanded the Victim's money and rings and when he took the money she had withdrawn from her bank accounts. The perpetrator falsely imprisoned the Victim and her children pursuant to section 787.01, and violated section 787.02 by kidnapping the children.

We cannot say that the non-sexual acts were "connected" to the sexual acts such that the non-sexual acts would not have occurred "but for" the sexual misconduct. It is completely plausible that the Victim and her children could have been assaulted, kidnapped, battered, held at knife-point, falsely imprisoned, and robbed, without the Victim having been raped, and have suffered the same or similar physical and mental injuries.

In our view, injuries "arising out of" an act of sexual misconduct can be distinguishable from injuries related to the non-sexual acts of the perpetrator. For instance, non-covered injuries could include any sexually-transmitted diseases, genital bruising, or any emotional trauma, subsequent sexual dysfunction, or loss of

21

consortium resulting solely from the rape portion of the Incident. All of these constitute injuries emanating from acts of sexual misconduct. We find it difficult to categorize a multi-crime episode, which included a kidnapping, an assault and battery, and a robbery, as simply incident to a rape. The Incident commenced with a kidnapping and battery of not only the Victim, but also her children, who played no part in any of the sexual acts. While the rape certainly punctuates the Incident, it was but one of the many traumatizing events to have occurred to the Victim and her family.

### 3. Distinguishing Excluded Conduct

Though the Florida courts have not construed such exclusions in the context of sexual misconduct, other jurisdictions provide some guidance. In Ledbetter, a woman was raped by a man who broke into her motel room and threatened her with various weapons. The man then kidnapped the woman by ordering her into his car. The woman eventually escaped as they drove out of the motel parking lot. The motel's insurer argued that coverage was excluded by an assault and battery exclusion. The Louisiana Supreme Court agreed that the exclusion applied to the rape, but disagreed as to the kidnapping, finding that the assault and battery exclusion did not exclude coverage for "damages resulting solely from the kidnapping." Id. at 1171.

22

The Colorado Supreme Court, in Bohrer v. Church Mutual Ins. Co., 965 P.2d 1258 (Colo. 1998), held that damages arising from sex during counseling sessions by a minister were excluded by a sexual misconduct exclusion, even though the policy covered counseling activities. The court reasoned that the counseling and the sexual misconduct were inseparably intertwined because they occurred at the same time and in the same place. However, injuries caused by counseling activities where sex did not occur were not excluded because those activities were separable in time and space. The court found that because the counseling relationship predated and continued for a period of time prior to the sexual conduct, and contributed to her emotional and physical distress, the causes were separable. Id. at 1261. "Had no sexual contact taken place, [the victim] could have had a viable claim against [the minister] for breach of fiduciary based solely on counseling activities for which the coverage of this policy is answerable." Id. at 1263.

The Insurer attempts to distinguish Bohrer from the present case, by arguing that the rape and the non-sexual acts are intertwined akin to the counseling sessions in Bohrer once the sexual relationship commenced. In Florida, however, it is the immediate cause (the act that causes the damage) rather than the underlying tort (the insured's negligence) that determines the number of occurrences. The Florida Supreme Court, in Koikos v. Travelers Ins. Co., 849 So.2d 263 (Fla. 2003), held that

23

each separate pull of a trigger during the same shooting spree is an event sufficiently separate in time and space to constitute an independent occurrence. As applied here, the Victim's injuries from assaults and batteries occurring during the course of the sexual acts may or may not be intertwined with the sexual misconduct, depending upon the perpetrator's purpose. However, non-sexual acts (the assaults, batteries, kidnapping, false imprisonment) occurring independent of the sexual acts, i.e., during the robbery, are not inseparably intertwined with the sexual misconduct.

Each of these non-sexual acts would constitute a crime and would have caused injuries (both physical and emotional) even without the existence of any sexual misconduct. Because the CGL does not unambiguously exclude coverage for injuries arising out of any non-sexual acts, such as kidnapping, assault, and battery, we hold that the CGL, at a minimum, covers any damages relating to the non-sexual acts of the Incident, and excludes only those injuries suffered as a result of the sexual acts.

We stress, however, and explain below, that we find that this represents coverage at a minimum. Under these circumstances, where the loss can be attributed to multiple causes, Florida law requires coverage of all of the Victim's injuries as related to the Incident.

B.

## 1. The Concurrent Cause Doctrine

In contending that the district court erred in granting summary judgment in favor of the Insurer, the Defendants contend the district court should have applied Florida's concurrent cause doctrine because the injuries were caused by two independent crimes, robbery as well as rape, one of which is covered. Florida's concurrent cause doctrine permits coverage under an insurance policy when the loss can be attributed to multiple causes, "as long as one of the causes is an insured risk." American Surety & Cas. Co. v. Lake Jackson Pizza, Inc., 788 So. 2d 1096, 1100 (Fla. 1st DCA 2001). This doctrine, however, is only applicable "when the multiple causes are not related and dependent, and involve a separate and distinct risk." Transamerica Ins. Co. v. Snell, 627 So. 2d 1275, 1276 (Fla. 1st DCA 1993) (citations omitted). The Victims argue that the district court improperly denied coverage for their injuries because the robbery gives rise to liability covered by the Church's CGL, and the Victims' injuries were incurred, at least in part, because the perpetrator intended to commit a robbery in addition to a sexual assault.

We agree. "Causes are dependent when one peril instigates or sets in motion the other." Paulucci v. Liberty Mut. Fire Ins. Co., 190 F.Supp.2d 1312, 1319 (M.D. Fla. 2002). In this case, the perils were independent. Robbery and rape have separate objectives that can work in tandem to cause one loss. For example, in Wallach v.

25

Rosenberg, 527 So. 2d 1386 (Fla. 3d DCA 1988), human negligence combined with weather peril to erode a sea wall, and although the policy excluded weather-related causes, it did protect the insured when loss resulted from human negligence. In affirming a verdict for the insureds, the court concluded that a "jury may find coverage when an insured risk constitutes a concurrent cause of the loss even where 'the insured risk is not the prime or efficient cause of the accident.'" Id. at 1387 (quoting 11 G. Couch, Couch on Insurance 2d § 44:268 (rev. ed. 1982)).[7]

A similar approach is warranted in this case. Where two crimes combine to cause a loss, it seems "logical and reasonable to find the loss covered . . . even if one of the causes is excluded from coverage." Id. at 1388. Robbery is not part and parcel to the crime of rape, and the same is true of kidnapping, assault, imprisonment, and battery. Perhaps the confusing element here is that the same actor committed all of the crimes. If the actions perpetrated that day, however, were only parts of one larger crime, that would obviate the rationale behind multiple criminal statutes under which an offender could be charged. In Palucci v. Liberty Mutual Fire Insurance Co., the

_____

[7] In Wallach, the court adopted the view of the California Supreme Court, which held that "coverage under a liability insurance policy is equally available to an insured whenever an insured risk constitutes simply *a* concurrent proximate cause of the injuries. That multiple causes may have effectuated the loss does not negate any single cause; that multiple acts concurred in the infliction of injury does not nullify any single contributory act." State Farm Mut. Auto. Ins. Co. v. Partridge, 514 P.2d 123, 130 (Cal. 1973) (en banc).

court observed that "where loss is caused by an unrelated simultaneous earthquake and lightning strike . . . the concurrent causation doctrine would apply and mandate coverage regardless of which peril was covered." 190 F.Supp.2d 1312, 1319 (S.D. Fla. 2002). We can similarly analogize. Much like the broad reach of nature's actions - a lightning strike and an earthquake - here, one person carried out all of the crimes. So, too, is the loss covered in this case.

The concurrent cause doctrine does not demand that we apportion the loss. See generally Wallach; see also Orient Mid-East Lines, Inc. v. Shipment of Rice on Board S.S. Orient Transporter, 496 F.2d 1032 (5th Cir. 1974) (holding shipowner liable for entire loss when it could not show how much of the damage resulted from a cause entitled to exemption); Fire Ass'n of Philadelphia v. Evansville Brewing Ass'n, 75 So. 196, 199 (Fla. 1917) (finding that plaintiff could recover for the entire loss, even if the loss was facilitated in part by an explosion excluded by the policy); Armco Chile Prodein, S.A. v. M/V Norlandia, 880 F.Supp. 781, 791 (M.D. Fla. 1995) (if claimant is able to prove at least a concurrent cause of damage, the burden then shifts back to the carrier to apportion between amount of damages caused by the exception and those damages caused by the covered cause; failure of carrier to differentiate causes of damage renders the carrier liable for the entire damage). If any apportionment or allocation is appropriate under Florida law, that is a matter for the state trial court.

The question before us is one of coverage and we find and hold that such exists.

C.

*1. Limits of Liability*

The Defendants also argue that the district court erred by applying the limitation of liability clause in the SML to limit the number of occurrences. In a footnote, the district court found that all of the acts in the Incident constituted one occurrence for the purposes of the limitation of liability provisions in the SML, thus limiting coverage under the SML to $100,000. The court relied on a paragraph in the SML that reads:

> Regardless of the period of time over which such acts occur or when damages are sustained, all acts of sexual misconduct by one person, or two or more persons acting together, or any breach of duty causing or contributing to such acts, will be considered one occurrence in determining our liability under this section.

The Defendants contend that the court erred in its application of this provision because the injurious acts of the perpetrator were not all "acts of sexual misconduct." We agree. The SML (and logically, its limitation of liability provision) applies only to injuries sustained "as a result of sexual misconduct," hence, any injuries excluded

28

by virtue of the Sexual Misconduct Exclusion. However, because we have found that CGL covers all of the Victims injuries as a result of the Incident, we will address only those applicable limits.[8]

The Limits of Liability under the bodily injury coverage of the CGL provide that the "Each Occurrence Limit" ($ 1 million) is the most the Insurer will pay for damages "because of all 'bodily injury' . . . arising out of any one occurrence." The Aggregate Limit is $2 million. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Under Florida law, "when the insured is being sued for negligent failure to provide security, an 'occurrence' is defined by the immediate injury-producing act and not by the underlying tortious omission." Koikos, 849 So.2d at 271 (footnote omitted). In so holding, the Florida Supreme Court found that, in Koikos, "the immediate causes of the injuries were the intervening intentional acts of the third party – the intruder's gunshots." Id. at 272. The court reasoned that "[t]o hold that the number of occurrences is determined by the time between each shot would turn an insurance coverage issue into an intensive fact-based inquiry requiring the

---

[8]As we mentioned earlier, the umbrella policy is, by stipulation, included in the decisions reached herein. However, the number of occurrences is not an issue under the umbrella policy because the Occurrence Limit and the Aggregate Limit are the same – $5 million.

selection of an arbitrary time interval to distinguish a single occurrence from multiple occurrences." Id. (citing American Indemnity Co. v. McQuaig, 435 So.2d 414, 416 n. 3 (Fla. 5th DCA 1983) ("Had [the insured] shot Pope, then left, and hours or days later shot McQuaig, there would be little argument that this was more than one occurrence. The only difference is that here, the time interval was relatively short.").

Here we face the same issue. The various acts committed by the perpetrator were separated by sufficient "time and space" so as to constitute separate occurrences under Koikos.[9] "[I]n an 'occurrence-based' policy, as distinguished from a per person/per accident policy, the limits of liability are defined by the occurrence and not on a per person basis." Koikos, 849 So.2d at 269. "Thus, under the policy in this case, the term 'occurrence' circumscribes the limits of liability by focusing on the event and not on the injuries." Id. Therefore, we find that each act of the perpetrator is considered one occurrence. Hence, the rape of the Victim is one occurrence; the robbery is another; the kidnapping of the Victim and her children is another; and each act of assault and battery upon the Victim and each of her children, is another.

---

[9]The Florida Supreme Court, in Koikos, expressly rejected the notion that the "continuous or repeated exposure" clause in the definition of "occurrence" was intended as limiting language. See id. at 267. The Florida Supreme Court and other jurisdictions have repeatedly held that such language was intended to broaden coverage "to apply to ongoing exposure to harmful environmental phenomena, and not to an insured's tortious omission." Id. at 268.

Because the Incident encompasses more than one occurrence, the CGL's Aggregate Limit of $2 million applies.

## Conclusion

In conclusion, we find that the district court erred in construing the Sexual Misconduct Exclusion in favor of the Insurer and as precluding coverage. Accordingly, we reverse the district court's grant of summary judgment and remand with directions to enter final judgment in favor of the Defendants, and thus, in favor of coverage.

REVERSED and REMANDED with instructions.