**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11230

_____

SHERIFF OF BROWARD COUNTY,

*Plaintiff-Appellee,*

*versus*

EVANSTON INSURANCE COMPANY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-62076-WPD

_____

_____

No. 24-13317

_____

SHERIFF OF BROWARD COUNTY,

*Plaintiff-Appellee,*

*versus*

EVANSTON INSURANCE COMPANY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-62076-WPD
_____

Before JILL PRYOR, LUCK, and HULL, Circuit Judges.

HULL, Circuit Judge:

In 2018, a shooting spree occurred at Marjory Stoneman Douglas High School in Parkland, Florida. After the shooting, victims filed 60 lawsuits against the Sheriff of Broward County, alleging negligent failure to secure the school once the shooting started.

This separate litigation involves only the excess insurance policy that the Broward County Sheriff's Office (the "Sheriff") had with Evanston Insurance Company ("Evanston"). That policy provided liability coverage after the Sheriff paid a $500,000 self-insured retention ("SIR") for each "occurrence."

The Sheriff sued for a declaration that (1) the Parkland shooting constituted a single "occurrence" under Evanston's policy, and (2) Evanston was required to pay excess judgments after the Sheriff paid a single $500,000 SIR, plus a $500,000 deductible. In response, Evanston asserted that each gunshot from the murderer's gun that caused injury was a separate occurrence, and

thus, the Sheriff had to pay dozens of SIRs before Evanston's coverage obligation was triggered. Evanston also contended that the Sheriff's declaratory judgment action presented no justiciable controversy because he had not yet paid the multiple SIRs and deductible in order to invoke coverage.

The district court granted the Sheriff's motion for summary judgment and his separate motion for attorney's fees and costs. The court ruled that (1) there was a ripe controversy allowing the Sheriff to seek a declaratory judgment as to the meaning of "occurrence" in the policy; (2) "occurrence," as defined in the policy, was ambiguous as a matter of controlling Florida law; (3) that ambiguity, construed in favor of the insured Sheriff, meant that the Parkland shooting was one occurrence under the policy; and (4) thus the policy required the Sheriff to pay only a single SIR plus the deductible. Because the Sheriff prevailed in that insurance dispute, the district court awarded attorney's fees and costs under Florida law. Evanston appealed.

After careful review and with the benefit of oral argument, we affirm.

## I. BACKGROUND

### A.    The Excess Insurance Policy

Evanston issued the Sheriff a public entity excess insurance policy for the period of October 1, 2017, to October 1, 2018. Under the policy, Evanston must "pay 'ultimate net loss' in excess of the [SIR.]"

"Ultimate net loss" is defined in the policy as "the total amount of damages and 'claim expenses', including any attorney fees awarded in favor of third parties that the insured is legally liable to pay because of 'bodily injury', 'property damage' or '*personal and advertising injury*.'" (Emphasis added.)

The policy had a $2,500,000 liability limit for each "occurrence" and up to a $5,000,000 aggregate liability limit. Evanston has no obligation to pay until the Sheriff's liability is determined by a (1) judgment against him in a "suit"; or (2) "[w]ritten agreement between [the Sheriff] and the claimant or the claimant's legal representative, but only if such written agreement receives [Evanston's] prior written consent."

## B.    "SIR" and "Occurrence"

Additionally, Evanston has no obligation to provide coverage until "[s]uch judgment or written agreement results in 'ultimate net loss' that exceeds the [$500,000 SIR]." The policy specifies that "[t]he [SIR] applies separately to each and every 'occurrence' and offense covered." "Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policy requires the Sheriff to "investigate and defend any 'claim' or 'suit' to which th[e] insurance applies" and states that the Sheriff "shall be responsible for the payment of any resulting 'claim expenses.'" The policy specifically states that "[a]ll payments for 'claim expenses' incurred by [the Sheriff] will be applied to the [SIR]."

The policy defines "claim expenses" as "reasonable amounts for defense of an insured against a specific claim or 'suit' to which" coverage applies, including "costs," "[l]egal expenses," and "[l]itigation costs," such as pre- and post-judgment interest.

## C.    Endorsement as to Claim Expenses

An endorsement to the policy alters certain terms as to claim expenses.    The endorsement is entitled "Claim Expenses—in Addition to the Limits of Insurance." (Capitalization modified.)  It states that if Evanston

> ha[s] an obligation . . . to pay "ultimate net loss" in excess of the [SIR], any "claim expenses" [Evanston] pay[s] will be in addition to, and will not reduce, the applicable [l]imits of [i]nsurance.  The definition of "ultimate net loss" is amended to remove reference to "claim expenses" and as a result, "claim expenses" will not be included in the calculation of "ultimate net loss."

## D.    Endorsement as to "Annual Aggregate Deductible"

The SIR is not the only amount that the Sheriff needs to pay to trigger Evanston's coverage.   The policy also contains an endorsement that adds an annual aggregate deductible of $500,000. It states:

> [Evanston's] obligation to pay "ultimate net loss" in excess of the [SIR] under this policy does not apply until [the Sheriff] ha[s] paid the full amount of the [a]nnual [a]ggregate [d]eductible [of $500,000].  The [a]nnual [a]ggregate [d]eductible applies to all

24-11230                 Opinion of the Court                 6

"ultimate net loss" in excess of the [SIR], regardless of the number of [c]overage [p]arts attached to this policy, insureds, claims ("claims") made or "suits" brought.

The [a]nnual [a]ggregate [d]eductible is not considered a part of the [SIR] and does not accrue to the exhaustion of the [SIR] . . . .

While the deductible is separate from the SIR, the deductible is not per occurrence but only an annual aggregate amount.

Taken together, Evanston is obligated to pay a claim only after (1) the Sheriff pays the $500,000 SIR for that "occurrence," which can be exhausted by claim expenses, judgments, or settlements, and (2) the Sheriff also pays the $500,000 annual aggregate deductible, which can be satisfied by payments aggregated on any covered occurrences during the policy period.[1]

### E.     The Parkland Shooting

On February 14, 2018, during the policy period, Nikolas Cruz entered the Parkland high school with an AR-15 rifle and killed 17 students and teachers and injured several more. The Sheriff employed a school resource officer, who was stationed at the high school that day. The families of the murdered and injured

---

[1] As discussed later, Evanston argues the deductible can be satisfied only by judgments and settlements, but the Sheriff argues it can be satisfied with claim expenses too. *See infra* note 4.

claimed that the Sheriff negligently failed to secure the school, through the actions of the school resource officer.

Shortly after the shooting, the Sheriff asked Evanston whether the shooting would be classified as one occurrence or multiple occurrences under the policy. On March 9, 2018, Evanston sent the Sheriff a "Reservation of Rights" letter. Evanston offered its "preliminary" opinion that "each victim in the Parkland shooting would represent a separate 'occurrence' under the Policy." On April 23, 2019, after receiving notice of a lawsuit against the Sheriff, Evanston sent another "Reservation of Rights" letter again contending that the shooting constituted multiple occurrences. Ultimately, 60 lawsuits were filed against the Sheriff alleging negligent failure to secure the school.

After multiple claims were filed against the Sheriff, the Sheriff sent a letter to Evanston on August 6, 2020. The Sheriff stated that he "ha[d] already expended $750,000 in regards to the Parkland [s]hooting." The Sheriff explained he would meet both of the coverage requirements, the $500,000 SIR and the $500,000 deductible, "in the very near future." The Sheriff also advised that he disagreed with Evanston's interpretation of "occurrence" under the policy and that the Parkland shooting incident should be classified as a single "occurrence." The Sheriff stated his expectation that, once the $500,000 SIR and $500,000 deductible were met, Evanston would "cover all future costs, attorney fees, and expenses related to [the Parkland shooting]."

On September 28, 2020, Evanston responded that it "maintain[ed] its position that each gunshot that resulted in injury or death to a victim of the shooting constitutes a separate 'occurrence' under the [p]olicy" and that the "$500,000 [SIR] . . . applie[d], at the very least, to each plaintiff victim in the lawsuits related to the shooting." This letter contained a claim number for the Parkland shooting. After engaging in an analysis of Florida law, Evanston stated that it "ha[d] no obligation to pay 'ultimate net loss' unless and until the $500,000 SIR is exhausted for each occurrence (i.e., at least every claim/suit) and the [a]nnual [a]ggregate [d]eductible has been satisfied."

## II. PROCEDURAL HISTORY

### A.    The Sheriff's Complaint

In 2022, the Sheriff filed an action for declaratory judgment against Evanston in Florida state court. After Evanston removed the case based on diversity jurisdiction, the Sheriff filed an amended complaint (the "complaint") for a declaratory judgment under Florida law, Fla. Stat. § 86.021.

The Sheriff's complaint asserted that he was seeking a declaratory judgment because (1) several lawsuits were filed against him by victims of the Parkland shooting and (2) he was "in doubt as to whether [Evanston] will take the position the Parkland [s]hooting [i]ncident constitutes a single 'occurrence' such that [the Sheriff] must only exhaust a single [SIR] of $500,000 before there is coverage under the [p]olicy."

The Sheriff's complaint alleged that Evanston "continue[d] to refuse to accept the Parkland [s]hooting [i]ncident as one occurrence under the [p]olicy," and that as a result the Sheriff "has directly incurred what [he] believes is a direct contractual obligation of [Evanston] and there exists a present, practical, bona fide need for a declaration." The Sheriff's complaint thus sought a declaration regarding the Sheriff's rights and obligations under the policy, "including (1) whether the Parkland [s]hooting [i]ncident was a single [o]ccurrence, and (2) whether [the Sheriff] must exhaust a single [SIR] of $500,000 or a [SIR] of $500,000 for each [p]laintiff that filed a lawsuit." He also sought attorney's fees and costs.

The Sheriff attached to the complaint two of the Parkland shooting lawsuits filed against him. The lawsuits allege that the Sheriff and his agent, the school resource officer, were negligent in failing to secure the school, resulting in more shooting injuries and deaths.

## B.    Evanston's Motion to Dismiss

On February 6, 2023, Evanston moved to dismiss for failure to state a claim, arguing that the Parkland shooting incident constituted multiple occurrences as a matter of law. *See* Fed. R. Civ. P. 12(b)(6). Evanston relied on *Koikos v. Travelers Insurance Co.*, 849 So. 2d 263 (Fla. 2003). The definition of "occurrence" in *Koikos* is identical to the definition in Evanston's policy. Evanston argued that the Florida Supreme Court in *Koikos* held as a matter of law that a perpetrator's shooting of two victims at the same restaurant

during a single incident was considered two separate "occurrences" under the Travelers policy.

The district court rejected Evanston's reading of *Koikos* and denied Evanston's motion. The district court interpreted the *Koikos* decision as holding that under Florida law (1) the term "occurrence" as defined in the policy is ambiguous and (2) ambiguous terms are construed in favor of the insured. The district court emphasized that the *Koikos* Court did not determine *as a matter of law* that "occurrence" *unambiguously* separates each victim of a single shooting incident. Next, applying *Koikos*, the district court found that the definition of "occurrence" in Evanston's policy was "nearly identical" to the definition in *Koikos*, and thus "occurrence" is ambiguous and must be construed in favor of the insured Sheriff. The district court concluded, construing "occurrence" in the insured Sheriff's favor in this case, that the Parkland shooting incident was only one "occurrence."

Besides relying on *Koikos*, the district court pointed to other Florida Supreme Court cases, such as *Guttenberg v. School Board of Broward County*, 303 So. 3d 518 (Fla. 2020). The Florida Supreme Court in *Guttenberg* held that the same Parkland shooting incident was one "occurrence" for purposes of a sovereign immunity damages cap.

## C.    Evanston's Motion for Summary Judgment

After discovery, Evanston and the Sheriff filed cross-motions for summary judgment. Evanston made three main arguments.

First, Evanston argued that the district court lacked jurisdiction because the Sheriff was seeking an advisory opinion. Because the lawsuits against the Sheriff remained pending, Evanston asserted that the possibility that the Sheriff would incur loss in excess of the SIR and the separate deductible was "purely hypothetical." Evanston also contended that (1) it was "impossible" that the Sheriff would face any liability above the statutory caps under Florida's sovereign immunity law, Fla. Stat. § 768.28, and (2) the Sheriff could never satisfy the $500,000 deductible.

Second, Evanston argued that the Parkland shooting constituted multiple occurrences because, under *Koikos*, each injury-causing gunshot was a separate "occurrence" as a matter of Florida law. The Sheriff thus had not satisfied the required multiple SIRs. Third, Evanston asserted that even if there were an ambiguity, the policy should not be construed in favor of the Sheriff because he was a "sophisticated insured."

## D.    The Sheriff's Motion for Summary Judgment

In his separate motion for summary judgment, the Sheriff first argued that he was entitled to a declaratory judgment because a bona fide dispute existed between him and Evanston regarding the proper interpretation of the policy terms and the parties' rights and obligations under it.

The Sheriff also contended that *Koikos* held that the meaning of "occurrence" was ambiguous and must be construed in his favor, which (when applied in this case) meant that the Parkland

shooting was one occurrence. The Sheriff further pointed out that Florida law recognized no "sophisticated insured" exception to its rules about construing ambiguous insurance policy terms.

### E.    Both Parties' Statements of Material Facts

In support of his motion for summary judgment, the Sheriff submitted a statement of material facts and a sworn declaration by John Greene, the Sheriff's Director of Risk Management. Greene stated that the Sheriff had "already exhausted" both the $500,000 SIR for the Parkland shooting and the separate $500,000 annual aggregate deductible.

As to the SIR, Greene averred that the Sheriff had paid more than $1 million in attorney's fees and costs for the defense of claims arising from the Parkland shooting. He attached a spreadsheet, dated August 1, 2023, in which each row of the spreadsheet listed a date, invoice number, attorney hours, paralegal hours, and a total amount paid.

In response, Evanston did not dispute that attorney's fees count toward the SIR and that the Sheriff had paid more than $500,000 in attorney's fees and costs associated with the Parkland shooting. Rather, Evanston argued that the Sheriff must satisfy the $500,000 SIR for each injury-causing gunshot and had not done so.

As to the deductible, Evanston argued "[t]here is no evidence in the record that [the Sheriff] has satisfied the [deductible]." However, Greene's declaration stated that the Sheriff had "already exhausted" the $500,000 deductible, although he did not explain specifically how it was satisfied.

Thereafter, the Sheriff submitted a response to Evanston's statement of material facts, in which he again stated that he had satisfied the $500,000 deductible. In another sworn declaration, Greene averred that, even excluding the Parkland shooting, the Sheriff had paid for other covered claims (1) "more than $2 million in claim expenses" and (2) "more than $1 million" in judgments and settlements.

Greene attached another spreadsheet for the relevant policy period. This spreadsheet was divided into rows by individual claim number and for each claim number listed the following: (1) coverage (type of claim); (2) paid legal; (3) paid liability (judgments and settlements); and (4) paid total. The coverage types are various, such as: employment; "BI Auto Liability"; "PD Auto Liability"; property damage; "Police Professional"; "Inland Marine"; and "Others." The spreadsheet shows that the Sheriff already had paid more than $1 million in judgments and settlements on claims (not related to the Parkland shooting), plus an additional $2 million in legal fees on them.

Evanston filed a reply "statement of facts" and again "disputed" that the Sheriff had satisfied the $500,000 deductible. But Evanston's "dispute" was that the payment of $1 million in judgments and settlements was "immaterial" legally because the Sheriff had not yet satisfied the SIR as to "every claim or occurrence." Here's what Evanston stated:

> 84.    Disputed. This statement [that the Sheriff paid more than $1 million in judgments and settlements

for covered claims during the policy period] is also immaterial as [the Sheriff] must first demonstrate that [he] has satisfied the [SIR] with respect to every claim or occurrence before [he] can apply any amounts paid in judgments or settlements to the [deductible] . . . .

85.    Disputed.   Further, this statement [that the Sheriff had satisfied the $500,000 deductible] is improper as it constitutes legal argument . . . .

In its reply brief, Evanston also made this argument about the Sheriff's second spreadsheet as to other covered claims during the policy period.  Evanston argued that (1) no individual paid claim on the spreadsheet had a "[p]aid [t]otal" over $500,000, (2) thus, the SIR was not exhausted for any of these other claims, and (3) consequently, none of the over $1 million in judgments and settlements paid by the Sheriff on those other covered claims contributed toward the deductible.

Other than its arguments about the Sheriff's second spreadsheet, Evanston introduced no evidence as to whether the Sheriff had satisfied the deductible.

## F.    District Court's Ruling

The district court granted the Sheriff's motion for summary judgment and denied Evanston's motion for summary judgment. At the outset, the district court determined that it had jurisdiction under the Declaratory Judgment Act because this was a bona fide dispute between the parties regarding their rights and obligations

under the policy as to whether the Sheriff must exhaust one or multiple SIRs in connection with the Parkland shooting.

The district court found that "[i]t is undisputed in the record that [the Sheriff] has already exhausted the separate $500,000 [deductible] by payment of covered judgments or settlements during the applicable period." In support, the district court cited to the Sheriff's response to Evanston's statement of material facts, which incorporated Greene's second declaration and the second spreadsheet, and Evanston's reply statement of facts. The district court rejected Evanston's argument that coverage could never be triggered by the Parkland shooting incident.[2]

Significantly, the district court ruled that the term "occurrence" in Evanston's policy was ambiguous under Florida law. As such, the district court resolved the ambiguity in favor of the insured Sheriff and in favor of coverage of the Parkland shooting as one occurrence, in effect yielding one SIR.

In reaching that conclusion, the district court rejected Evanston's arguments for application of a sophisticated-insured rule. It explained that (1) Evanston's arguments relied almost entirely on non-binding caselaw from other jurisdictions and (2) the sophisticated-insured rule was contrary to well-settled

---

[2] After ruling the Sheriff had exhausted the deductible by payment of covered judgments and settlements, the district court did not address (1) the Sheriff's argument that his payment of over $1 million in claims expenses in defending the Parkland lawsuits satisfied both the SIR and the deductible or (2) Evanston's argument about Florida's statutory damages cap.

Florida principles of insurance policy interpretation, under which the Sheriff's subjective intent and supposed sophistication were irrelevant to construing ambiguous policy terms.

## G.    The Sheriff's Motion for Attorney's Fees and Costs

Subsequently, the Sheriff moved for attorney's fees and non-taxable costs under both Fla. Stat. §§ 626.9373 (surplus carrier) and 627.428(1) (regular carrier). Those statutes instruct courts to award reasonable attorney's fees to insured parties who received a favorable judgment against their insurer. Fla. Stat. §§ 626.9373(1), 627.428(1) (2022). Opposing the motion, Evanston argued that Florida law required an incorrect denial of benefits by the insurance company before the insured could recover attorney's fees. Evanston argued it had not actually denied benefits.

In reply, the Sheriff pointed to the September 28, 2020 letter from Evanston. In that letter, Evanston told the Sheriff that it had "no obligation to pay" until the Sheriff paid a separate SIR for each victim of the shooting.

After the magistrate judge's report and recommendation and Evanston's objections, the district court granted the Sheriff's motion under Fla. Stat. § 626.9373. The district court found, as did the magistrate judge, that the September 28 letter "unequivocally denied insurance benefits until [the Sheriff] exhaust[ed] the $500,000 SIR at least for each plaintiff shooting victim's claim against [the Sheriff]." Given the district court's ruling that the Parkland shooting was one occurrence, this was an incorrect denial of benefits.

Evanston timely appealed.

## III. STANDARD OF REVIEW

We review our jurisdiction *de novo*. *Nationwide Mut. Ins. Co. v. Barrow*, 29 F.4th 1299, 1301 (11th Cir. 2022).

We review *de novo* a district court's summary judgment ruling, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party. *State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023); *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004). Likewise, we review *de novo* questions of law, including the interpretation of an insurance contract. *Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1302 (11th Cir. 2022).

We review *de novo* whether a district court applied the proper legal standard for the award of attorney's fees. *Smalbein ex rel. Est. of Smalbein v. City of Daytona Beach*, 353 F.3d 901, 904 (11th Cir. 2003). We review for clear error the district court's factual findings, and we review for abuse of discretion a district court's decision on whether to award attorney's fees. *Id.*

## IV. JURISDICTION

On appeal, Evanston contends that the district court lacked jurisdiction because there is no case or controversy under the Declaratory Judgment Act. Evanston argues that the Sheriff's complaint presents no justiciable controversy because: (1) the Sheriff has not yet incurred any judgments or settlements for the Parkland shooting; (2) the Sheriff has not satisfied the

preconditions to coverage—the SIR and deductible amounts; and (3) Florida law caps the amount recoverable in tort actions against state agencies at $300,000 per occurrence, so the Parkland shooting itself could never independently satisfy the $500,000 deductible. Evanston asserts that the Sheriff effectively sought an advisory opinion, which the district court was without jurisdiction to provide. We disagree and explain why the Sheriff clearly established a justiciable controversy.

## A.    Justiciable Controversy and Standing

Article III of the Constitution limits the jurisdiction of federal courts to only "Cases" or "Controversies." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019). Accordingly, the federal Declaratory Judgment Act empowers a district court to enter a judgment "declar[ing] the rights and other legal relations of any interested party" *only in "a case of actual controversy within its jurisdiction*," regardless of whether "further relief is or could be sought."[3]    28 U.S.C. § 2201(a) (emphasis added). The Act's "actual controversy" requirement "[e]cho[es]" Article III's standing requirement. *A&M Gerber Chiropractic*, 925 F.3d at 1210.

"The difference between an abstract question and a 'controversy' . . . is necessarily one of degree . . . ." *GTE Directories Publ'g Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1567 (11th Cir. 1995)

_____

[3] The district court had subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

(quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  The basic question "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.*  The controversy must be more than "conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *A&M Gerber Chiropractic*, 925 F.3d at 1210 (quotation marks and citation omitted).

This Court has explained what "satisfies Article III's standing requirement when a plaintiff is seeking declaratory relief—as opposed to seeking damages for past harm." *Id.* at 1210-11.  To establish a justiciable controversy and standing, "the plaintiff must allege facts from which it appears that there is a substantial likelihood that he will suffer injury in the future." *Id.* at 1211 (quotation marks omitted).  "[I]f a plaintiff does not assert a reasonable expectation of future injury, he lacks standing to bring an action for declaratory relief." *Id.* (quotation marks omitted and alterations adopted).

Further, to establish standing at the summary judgment stage, the plaintiff "must set forth by affidavit or other evidence specific facts" establishing an actual controversy. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation marks omitted).  And the justiciable controversy must have existed at the time the

plaintiff filed the complaint. *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995).

## B.    Analysis

For starters, there is no fixed requirement that an insured, like the Sheriff, must incur a judgment or settlement before he can bring a declaratory judgment action over an insurer's denial of insurance coverage. Rather, it is well settled that certain actions for declaratory relief regarding the extent of insurance coverage may present a justiciable controversy before a final liability judgment is rendered against a named insured. *See, e.g.*, *Md. Cas.*, 312 U.S. at 271-74 (finding a justiciable controversy where (1) an insured's employee driving a truck got into an accident, (2) the other driver sued the insured, (3) judgment was not yet granted, and (4) the insurer sought a declaratory judgment that it was not liable to defend or indemnify the insured due to a provision in the policy); *Edwards v. Sharkey*, 747 F.2d 684, 687 (11th Cir. 1984) (noting that the district court had jurisdiction to rule on an insurance coverage dispute related to litigation arising from a car collision even in the absence of a final judgment in the underlying tort litigation).

Indeed, because declaratory judgments in insurance cases are about disputed coverage and future liability, any injury or final judgment often has not yet happened. So, the test for standing is forward-looking. *See A&M Gerber Chiropractic*, 925 F.3d at 1210-11.

Here, the question in this case becomes: Has the Sheriff alleged enough facts from which it appears that there is a

substantial likelihood that he will suffer injury in the future? For multiple reasons, the Sheriff has clearly established a substantial likelihood of future injury.

Evanston does not dispute that (1) the mass shooting occurred at a high school in Parkland where the Sheriff employed a school resource officer; (2) 60 Parkland-related lawsuits have been filed against the Sheriff; (3) the Sheriff already has spent more than $500,000 in attorney's fees and costs defending those Parkland lawsuits; and (4) Evanston told the Sheriff that it would not provide coverage until the Sheriff has paid a $500,000 SIR for every plaintiff shooting victim, claiming each gunshot is a separate "occurrence."

We further reject Evanston's argument that this dispute is not sufficiently immediate because the Sheriff has not yet paid the $500,000 SIR for each gunshot or each shooting victim. This argument relies on Evanston's position that every gunshot (or at least every injured victim) was a separate occurrence under the policy, triggering multiple SIRs before coverage. When assessing standing, we assume the merits of the Sheriff's claim—including his reading of the policy terms—in deciding whether there is an injury. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1278 (11th Cir. 2022) ("[W]hen addressing standing, we must assume that the plaintiffs would be successful on the merits of their . . . claims."). Evanston cannot import its merits argument into the standing discussion. If we assume the Sheriff's reading of "occurrence" is right, and the Parkland shooting was a single occurrence, the $500,000 SIR

24-11230          Opinion of the Court          22

already was satisfied by the Sheriff's payment of over $1 million in claims expenses defending the Parkland lawsuits.

As for the deductible, the Sheriff asserted that he satisfied the $500,000 annual *aggregate* deductible from paid judgments and settlements in other covered claims during the policy period. This allegation was supported by Greene's two declarations and the second spreadsheet, which showed that the Sheriff had paid more than $1 million in judgments and settlements on other covered claims during the policy period. Greene's first declaration alone stated the Sheriff had "already exhausted" the deductible. Although in the district court Evanston stated this fact was "disputed," it did so without pointing to any evidence in the record to show that this stated fact was in dispute. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). At this juncture, all we need to decide is that the Sheriff has shown a substantial likelihood that he will suffer an injury in the future. *See A&M Gerber Chiropractic*, 925 F.3d at 1211. Greene's declarations and the second spreadsheet are sufficient for this limited purpose.[4]

---

[4] The Sheriff also asserts that he satisfied the deductible by payment of claim expenses defending the Parkland lawsuits. Evanston argues that only judgments and settlements could satisfy the deductible. Evanston relies on the endorsements adding the annual aggregate deductible and eliminating claims expenses from the definition of "ultimate net loss." This is a coverage issue that we need not resolve to decide the standing issue.

We recognize that Evanston argued that the Sheriff's own second spreadsheet showed (1) no individual claim number on the spreadsheet had a total paid over $500,000, (2) the SIR was thus not exhausted for any of these claims, and (3) consequently, none of the judgments and settlements paid by the Sheriff on those claims contributed toward the deductible. In other words, because no individual paid claim number was over $500,000, no SIR was satisfied for that claim number and none of the payments on the spreadsheet counted toward the deductible.

The problem with Evanston's argument is that the Sheriff's second spreadsheet does not show what Evanston contends. The Sheriff's spreadsheet is not organized by "occurrence," but by individual claim number. So it does not show that the Sheriff never paid more than $500,000 on one "occurrence." For all we know, many of these claims, like the 60 lawsuits here, arose out of one occurrence, and the amounts paid on the individual claims should be combined and counted as to a single "SIR" for that one occurrence. At most, Evanston's argument is based on speculation about the second spreadsheet, and certainly not evidence that each individual claim number was part of a separate occurrence. Evanston failed to offer any evidence refuting Greene's declarations that the Sheriff had satisfied the deductible, and at a minimum, the Sheriff has set forth sufficient facts to establish standing to litigate the "occurrence" issue. *See Lujan*, 504 U.S. at 561.

To recap, the standing test requires only a substantial likelihood of an injury—not an actual injury. *A&M Gerber Chiropractic*, 925 F.3d at 1211. And the evidence shows that there was a substantial likelihood the Sheriff satisfied both the SIR and deductible at the time he filed this declaratory judgment action. The Sheriff's potential injury was not "conjectural" or "hypothetical," but sufficiently immediate to confer standing.[5] *See id.* at 1210 (quotation marks and citation omitted).

Finally, Evanston's argument about Florida law's $300,000 damages cap also fails. Specifically, Evanston argues that the Parkland incident cannot "independently trigger coverage" because of Florida's sovereign immunity laws, which limit liability in tort actions against state agencies to $200,000 per victim and $300,000 per occurrence. *See* Fla. Stat. § 768.28(5)(a). This statutory damages cap is irrelevant to the coverage issue here. Because the SIR may be satisfied by "claim expenses," the statutory cap on judgments has no bearing on whether the SIR can be satisfied. The evidence is undisputed that the Sheriff already hit that $500,000 SIR amount for the Parkland incident based on claims expenses alone.

And the deductible is the annual *aggregated* deductible, so there is no requirement that the Parkland shooting "independently" satisfy the deductible. If the Sheriff satisfied the

---

[5] To be clear, we do not hold the Sheriff has as a matter of law and in fact satisfied the deductible from judgments and settlements for other covered claims. That is a more complicated coverage issue for another day.

24-11230              Opinion of the Court                    25

deductible from separate litigation, as he asserted and Evanston failed to adequately dispute, then Florida's statutory cap has no bearing on whether the Sheriff can meet his prerequisites for coverage.[6]  In sum, we easily conclude that the Sheriff established a justiciable controversy and jurisdiction.  We now turn to whether under Florida law the Parkland shooting is one "occurrence" under the Sheriff's policy.

## V. "OCCURRENCE"

### A.    Ordinary Rules of Contract Construction

"Under Florida law, ordinary contract principles govern the interpretation and construction of insurance policies."  *L. Squared Indus. v. Nautilus Ins. Co.*, ___ F.4th ___, No. 23-13031, slip op. at 8-9 (11th Cir. Oct. 15, 2025) (citing *Graber v. Clarendon Nat'l Ins. Co.*, 819 So. 2d 840, 842 (Fla. Dist. Ct. App. 2002)).  And under Florida law, a court must first examine the natural and plain meaning of the policy's language.  *Westchester Gen. Hosp.*, 48 F.4th at 1302.  Florida courts must apply "the ordinary rules of construction," and, "if a policy provision is clear and unambiguous, it should be enforced according to its terms."  *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) (quotation marks and citations omitted).

---

[6] The Sheriff also asserted that the Parkland shooting victims' claims against him could fall under one of the exceptions to Florida's statutory damages cap in Fla. Stat. § 768.28(5)(a).  We need not decide that issue to resolve the justiciable-controversy question.

Yet, "if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous." *Id.* (quotation marks omitted and alterations adopted). If the insurance policy is ambiguous, it is "construed against the insurer and in favor of coverage."[7] *Id.*; *State Farm Mut. Auto. Ins. Co. v. Menendez*, 70 So. 3d 566, 570 (Fla. 2011).

## B.    The *Koikos* Decision

Fundamentally, the parties disagree about what the Florida Supreme Court actually decided in *Koikos*. We thus examine in detail what *Koikos* said—and what it did not say.

*Koikos* involved a shooting of multiple persons at a restaurant in Florida. 849 So. 2d at 264-65. The shooter was turned away from a party at the restaurant. *Id.* at 265. The shooter returned to the party, brandished a firearm, and fired "in two separate[—]but nearly concurrent[—]rounds." *Id.* (quotation marks omitted). Two bullets separately struck two individuals, and several others suffered injuries. *Id.* The two bullet-struck individuals filed separate lawsuits against the restaurant owner

---

[7] This is known as the *contra proferentem* rule of insurance contract interpretation. *See Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.*, 65 F.4th 623, 627-28 (11th Cir. 2023) (applying Florida law). The Florida Supreme Court has clarified that ambiguities in insurance contracts should be resolved by *contra proferentem* without regard to extrinsic evidence of the parties' supposed "intent." *Id.* at 628.

(Koikos), alleging the owner negligently failed to provide security. *Id.*

The restaurant owner in *Koikos* brought a declaratory action against his insurance company, who removed the action to federal court. *Id.* The issue was whether the shooting incident constituted one or two separate occurrences. *Id.* That distinction mattered because the insurance policy covered $500,000 per occurrence. *Id.* The insured restaurant owner had more coverage if the incident was two occurrences. *Id.* On the other hand, the insurer contended that the restaurant owner's alleged negligence was a single "occurrence" that caused both victims' injuries. *Id.*

The federal district court in *Koikos* ruled that the shooting incident constituted one "occurrence" as a matter of law. *Id.* On appeal, this Court certified the "occurrence" question to the Florida Supreme Court, as follows:

> Did the injuries sustained by [the two victims] result from a single occurrence or multiple occurrences under the terms of the insurance policy issued to Koikos by defendants?

*Id.* at 264 n.1 (capitalization altered). The Florida Supreme Court rephrased our question as:

> When the insured is sued based on negligent failure to provide adequate security arising from separate shootings of multiple victims, are there multiple occurrences under the terms of an insurance policy that defines occurrence as "an accident, including

> continuous or repeated exposure to substantially the same general harmful conditions"?

*Id.* at 264 (capitalization altered).  In answering the question, the Florida Supreme Court engaged in a three-step process.

First, the Florida Supreme Court looked to the plain language of the policy.  *See id.* at 266.  The Court noted that the policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[8]  *Id.*  The Court recognized, "[f]ew insurance policy terms have provoked more controversy in litigation than the word 'accident.'"  *Id.* (quotation marks and citation omitted).

Second, the Florida Supreme Court considered whether it should apply the "cause theory" or the "effect theory."  *Id.* at 269.  It stated: "Absent explicit policy language, most jurisdictions apply the 'cause theory,' which looks to the cause of the injuries, rather than the 'effect theory,' which looks to the number of injured plaintiffs."  *Id.* (quoting *Am. Indem. Co. v. McQuaig*, 435 So.2d 414, 415 & n.1 (Fla. Dist. Ct. App. 1983)).  The Florida Supreme Court concluded that Florida applies the "cause theory."  *Id.*

This, however, did not resolve the *Koikos* question of whether the cause of the injury was (1) the negligence of the insured restaurant owner, or (2) the "intervening intentional acts of the third party[—]the intruder's gunshots."  *Id.*  "[I]n the absence of clear language to the contrary," the Florida Supreme Court

---

[8] That is the word-for-word definition of "occurrence" in Evanston's policy.

decided that it "is the *act* [the gunshots] that causes the damage, which is neither expected nor intended from the standpoint of the insured, that constitutes the 'occurrence,'" not the insured's underlying negligence. *Id.* at 271 (emphasis added).

Importantly though, the Florida Supreme Court in *Koikos* emphasized, "even if we accepted [the insurer's] construction of the policy as a reasonable interpretation, the insurance policy would be considered ambiguous because the relevant language would be susceptible to more than one reasonable interpretation." *Id.*

Third, the Florida Supreme Court inquired whether each gunshot was a separate "occurrence" or if all gunshots were one "occurrence." *Id.* at 272. The Florida Supreme Court held the definition of "occurrence" was ambiguous:

> The policy's definition of occurrence as applied to the facts of this case *is susceptible to more than one reasonable interpretation.* "Occurrence" can reasonably be stated to refer to the entire shooting spree or to each separate shot that resulted in a separate injury to a separate victim. *Accordingly, we construe the term "occurrence" in [the] policy in favor of the insured.*

*Id.* at 273 (emphases added).

The Florida Supreme Court also reasoned that there was "no unambiguous language" in the policy that would put the owner on notice that a "series of similar causes" would be

considered one "occurrence." *Id.* Construing the policy in favor of the insured restaurant owner, the Florida Supreme Court stated:

> We look not to the number of injuries or victims, i.e., we do not apply the "effect theory," but rather we focus, under the "cause theory," on the independent *immediate* acts that gave rise to the injuries and [the owner's] liability. *In this case*, each shooting constitutes a separate occurrence subject to the "Each Occurrence Limit" of $500,000 . . . .

*Id.* (second emphasis added).

In short, while *Koikos* is no model of clarity, we read *Koikos* as holding (1) the "occurrence" term was ambiguous; (2) "occurrence" should be construed in favor of the insured; and (3) doing that under the facts in *Koikos* meant the shooting of two victims was two separate "occurrences."

## C.    Subsequent Florida Decisions Applying *Koikos*

Florida courts consistently have concluded that *Koikos* was decided on ambiguity grounds and by construing "occurrence" in favor of the insured and in favor of coverage. *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 534 (Fla. 2005); *Maddox v. Fla. Farm Bureau Gen.*, 129 So. 3d 1179, 1182 (Fla. Dist. Ct. App. 2014); *Dep't of Fin. Servs. v. Barnett*, 262 So. 3d 750, 751, 754 (Fla. Dist. Ct. App. 2018).

Starting in *Taurus Holdings*, the Florida Supreme Court discussed *Koikos* in answering another certified question from us concerning a different insurance policy provision. 913 So. 2d at

531. In describing *Koikos*'s holding, the Florida Supreme Court stated that (1) *Koikos* held that the "policy's definition of occurrence as applied to the facts of this case is susceptible to more than one reasonable interpretation"; (2) "[b]ecause the term 'occurrence' was ambiguous, [the *Koikos* Court] construed it in the insured's favor"; and (3) *Koikos* "held that the injuries arose from the shooting and not from the insured's negligence." *Id.* at 534 (quotation marks omitted). In *Taurus Holdings*, the Florida Supreme Court explicitly recognized that *Koikos* was decided on ambiguity grounds. *Id.*; *see also Maddox,* 129 So. 3d at 1180-82 (interpreting an insurance policy with an identical definition of "occurrence," explaining that *Koikos* was decided on ambiguity grounds, determining that an incident in which a dog bit two people could reasonably be considered one or two occurrences, and construing the policy in favor of the insured).

Florida courts have also explained that *Koikos* was decided on ambiguity grounds in another context. In *Barnett*, the State of Florida sought a declaratory judgment that a shooting was one "incident or occurrence" under Florida's sovereign immunity statute, Fla. Sta. § 768.28(5), which limited the state's liability to $200,000 per "incident or occurrence." *See Barnett*, 262 So. 3d at 751-52. Florida's Fourth District Court of Appeal cited *Koikos* in its opinion, noting that *Koikos* "relied on" the rule that ambiguity must be construed in favor of the insured. *Id.* at 754. The Florida appellate court explained that, in contrast, the Florida sovereign immunity statute "must be strictly construed with any ambiguities being resolved against waiver" of immunity. *Id.* Construing the

statute against waiver of immunity, that Florida court concluded that the shooting was one "occurrence." *Id.*

The *Barnett* case then went before the Florida Supreme Court, which did not expressly state what *Koikos* held. *See Barnett v. Dep't of Fin. Servs.*, 303 So. 3d 508, 516 (Fla. 2020). But it agreed with the appellate court that, for purposes of the per-occurrence sovereign immunity damages cap in Fla. Stat. § 768.28(5), the shooting was a single "incident or occurrence." *Id.* at 510.

The Florida Supreme Court later found the *Barnett* holding controlling in *Guttenberg*, when it considered whether, for purposes of the same sovereign immunity damages cap, the Parkland shooting likewise was a single "incident or occurrence." *Guttenberg*, 303 So. 3d at 519. The Florida Supreme Court held that the Parkland shooting was a single "incident or occurrence" for purposes of the sovereign immunity damages cap. *Id.*

**D.    *GuideOne Elite***

Evanston points to our decision in *GuideOne Elite* as evidence that *Koikos* decided, as a matter of law and not based on ambiguity, each gunshot during the same shooting spree constitutes a separate "occurrence." *GuideOne Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1331-32 (11th Cir. 2005) (applying Florida law). For several reasons, Evanston misreads *GuideOne Elite*.

*GuideOne Elite* concerned a mother and her children who were kidnapped in a church parking lot. *Id.* at 1320-21. The perpetrator also robbed and physically and sexually abused the

mother. *Id.* at 1321-22. The case concerned the interpretation of the church's liability insurance policy and its sexual misconduct exclusion. *Id.* at 1322-23. This Court discussed *Koikos* in two parts of its opinion: (1) in determining whether the non-sexual criminal acts were "inseparably intertwined with the sexual misconduct" (and thus subject to the sexual conduct exclusion); and (2) in determining whether the incident was one or multiple "occurrences" for the purpose of determining the limits of coverage. *Id.* at 1329, 1331-32.

In the first part, this Court in dicta merely recounted *Koikos*'s bottom line, as follows: "The Florida Supreme Court, in [*Koikos*], held that each separate pull of a trigger during the same shooting spree is an event sufficiently separate in time and space to constitute an independent occurrence." *Id.* at 1329. *GuideOne Elite* did not acknowledge or address the ambiguity question in *Koikos*, or the Florida Supreme Court's reasoning, that led to that bottom line. *See id.*

Moreover, *GuideOne Elite* dealt with a very different factual scenario—it was not a mass shooting case—and was interpreting a very different policy provision—a sexual misconduct exclusion. *See id.* While we applied *Koikos*, we concluded that the "non-sexual acts" were "not inseparably intertwined with the sexual misconduct" and thus were not excluded under the sexual misconduct exclusion in the policy. *Id.*

The second part of the *Koikos* discussion in *GuideOne Elite* is more similar to the issue here. This Court recited *Koikos*'s holding

that occurrence is defined by "the intervening intentional acts of the third party" and "not by the underlying tortious omission." *Id.* at 1331 (quoting *Koikos*, 849 So. 2d at 271-72). In *GuideOne Elite*, that meant occurrence was defined by the perpetrator's criminal acts and not the insured church's negligence. *Id.* at 1331-32. And we concluded the perpetrator's acts were separated by sufficient time and space so as to constitute separate occurrences under *Koikos*. *Id.* at 1332.

Nonetheless, contrary to Evanston's position here, this Court in *GuideOne Elite* never explicitly stated that *Koikos* held *as a matter of law* that separate gunshots are separate occurrences. Instead, we said that *Koikos* "held that each separate pull of a trigger during the same shooting spree is an event *sufficiently separate* in time and space *to constitute an independent occurrence*." *Id.* at 1329 (emphasis added). This does not conflict with the conclusion that *Koikos* found counting separate gunshots as "occurrences" as one of two reasonable interpretations of the term. We also did not say whether "occurrence" was ambiguous or unambiguous as used in the policy in *Koikos* or in *GuideOne Elite*. *See id.* at 1331-32. And interpreting "occurrence" in *GuideOne Elite* to mean each criminal act was a separate "occurrence" was beneficial to the insured, which would receive a higher limit on coverage.

To the extent that there is any suggestion in *GuideOne Elite* that *Koikos* found "occurrence" unambiguous, the Florida Supreme Court cleared up any confusion in *Taurus Holdings*. *See Taurus Holdings*, 913 So. 2d at 534. The Florida courts understand Florida

law better than we do, and we defer to their subsequent decisions that clarified *Koikos*. *GuideOne Elite* thus does not change our determination that *Koikos* was decided on ambiguity grounds.[9]

## VI. RESOLVING THE AMBIGUITY

We now apply Florida law to this case. Because the term "occurrence" is ambiguous, we must construe it in favor of the insured Sheriff. *Taurus Holdings*, 913 So. 2d at 532; *Koikos*, 849 So.2d at 273. Construing the term "occurrence" in favor of the Sheriff, we conclude the entire Parkland shooting was a single occurrence. Because the entire Parkland shooting is one occurrence, only a single SIR applies.

---

[9] Another observation. *GuideOne Elite* was published on August 19, 2005, before *Taurus Holdings* was published on September 22, 2005. So *GuideOne Elite* had only *Koikos* before it. Thereafter, *Taurus Holdings* explicitly recognized that *Koikos* was decided on ambiguity grounds as to the meaning of "occurrence." *Taurus Holdings*, 913 So. 2d at 531.

It is worth noting that our prior panel precedent rule is at its weakest in diversity cases. *See World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009). "[I]f state law changes or is clarified in a way that is inconsistent with the state law premise of one of our earlier decisions, the prior panel precedent rule does not bind us to follow our earlier decision." *Id.* (quotation marks and citation omitted); *see also United States v. Clarke*, 822 F.3d 1213, 1215 (11th Cir. 2016) ( "[I]f . . . the Florida courts cast doubt on our interpretation of state law, a panel is free to reinterpret state law in light of the new precedents." (quotation marks omitted and alteration adopted)). At bottom, *Taurus Holdings*, *Maddox*, and *Barnett* have now fully clarified Florida law on this "occurrence" issue. *See Taurus Holdings*, 913 So. 2d at 534; *Maddox*, 129 So. 3d at 1182; *Barnett*, 263 So. 3d at 754.

Lastly, Evanston argues that we should not apply the well-settled Florida rule construing an ambiguity in favor of the insured because the Sheriff is a sophisticated insured. But Evanston cites no cases from the Florida Supreme Court or Florida appellate courts actually applying a sophisticated-insured exception. Evanston also urges us to consider extrinsic evidence of the parties' negotiations in resolving the ambiguity in the meaning of "occurrence." But this Court has already explained that "Florida law is clear that . . . ambiguity is resolved in favor of coverage and against the insurer, without regard to extrinsic evidence of the parties' supposed intentions or expectations." *Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.*, 65 F.4th 623, 630 (11th Cir. 2023); *see also Wash. Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 945 (Fla. 2013) (holding that "because the policy is ambiguous it must be construed against the insurer and in favor of coverage without resort to consideration of extrinsic evidence").

Because under controlling Florida law, "occurrence" is ambiguous and must be construed in favor of the insured, the district court did not err by concluding the Parkland shooting was one occurrence under Evanston's policy and granting summary judgment for the Sheriff on that basis.

## VII. ATTORNEY'S FEES AND NON-TAXABLE COSTS

The final issue Evanston argues is that it never "denied" insurance benefits under the policy, and therefore it owed no attorney's fees or non-taxable costs to the Sheriff under Fla. Stat.

§§ 627.428 (regular insurance carriers) or 626.9373 (surplus carriers).[10]  We disagree.

Although the Florida legislature has repealed Fla. Stat. §§ 627.428 and 626.9373, that repeal went into effect in March 2023, after Evanston issued the policy and after the Sheriff filed this suit. The repeal delineates that it applies only to cases filed *after* it became effective.  *See* 2023-15 Fla. Law 20 ("Except as otherwise expressly provided in this act, this act shall apply to causes of action filed after the effective date of this act.").

Before March 2023, Fla. Stat. § 626.9373 provided:

> [U]pon the rendition of a judgment or decree by any court of this state against a surplus lines insurer in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer on or after the effective date of this act, the trial court or, if the insured or beneficiary prevails on appeal, the appellate court, shall adjudge or decree against the insurer in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the lawsuit for which recovery is awarded.

Fla. Stat. § 626.9373(1) (2022).  Section 627.428 had nearly identical language.  *See* Fla. Stat. § 627.428(1) (2022).

---

[10] Under Fla. Stat. § 626.9373, the obligation to pay attorney's fees is a matter of substantive law, so state law applies here.  *See All Underwriters v. Weisberg*, 222 F.3d 1309, 1311-12 (11th Cir. 2000) (interpreting Fla. Stat. § 627.428).

Given these terms are nearly identical, both statutes were designed "to penalize an insurance company for wrongfully causing its insured to resort to litigation in order to resolve a conflict with its insurer when it was within the company's power to resolve it." *Bassette v. Standard Fire Ins. Co.*, 803 So. 2d 744, 746 (Fla. Dist. Ct. App. 2001) (interpreting Fla. Stat. § 627.428).

Under these Florida laws, an insured may recover attorney's fees when there has been (1) "an incorrect denial of benefits" and (2) "a judgment or its equivalent of payment in favor of the insured." *Johnson v. Omega Ins. Co.*, 200 So. 3d 1207, 1219 (Fla. 2016) (interpreting Fla. Stat. § 627.428(1)). As to the first requirement, the Florida courts have awarded attorney's fees where the insurance company "did not actually deny coverage under the policies" but instead "informed [the insured] that coverage could be denied" if a certain prerequisite was not satisfied. *Bassette*, 803 So. 2d at 746.

In *Bassette*, the insurance company "threatened a denial of coverage," by stating that "coverage could be denied if" the plaintiff refused to sign requested authorization forms. *Id.* at 745-46. This was enough to meet the denial-of-claim element under the attorney's fees statute. *Id.* at 746.

As to the second requirement, the Florida courts have awarded attorney's fees when the "insured prevail[ed] in a declaratory judgment action regarding coverage." *Id.*

Here, the district court's grant of attorney's fees and costs to the Sheriff was based on its fact finding that Evanston had denied

insurance benefits under the policy in its September 28, 2020 letter. We do not discern clear error in the district court's finding. *See Smalbein*, 353 F.3d at 904. At a minimum, Evanston's letter threatened to deny coverage, as in *Bassette*. *See Bassette*, 803 So. 2d at 746. Plus, the district court entered a judgment in favor of the insured Sheriff on a significant coverage issue—the meaning of occurrence as applied to the Parkland shooting.

The Sheriff thus established both an incorrect denial of benefits and a dispute resolved by a judgment in his favor. Evanston has shown no reversible error in the district court's award of attorney's fees and costs in favor of the Sheriff.

## VIII. CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment to the Sheriff and its grant of attorney's fees and non-taxable costs to the Sheriff.

**AFFIRMED.**